No. 52,849

In the Matter of the Certificate of Need Application by the Bethany Medical Center for a Six (6) Megavoltage Linear Accelerator.

(630 P.2d 1136)

Opinion filed July 17, 1981.

*Emily E. Cameron,* of the Kansas Department of Health and Environment, of Topeka, argued the cause and was on the brief for appellant.

*Robert A. DeCoursey,* of Kansas City, argued the cause and was on the brief for Providence-St. Margaret Health Center, appellant-intervenor.

*Leonard O. Thomas* and *David K. Fromme,* of Weeks, Thomas & Lysaught, Chartered, of Kansas City, argued the cause and were on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: The Kansas Department of Health and Environment (KDHE) appeals from a Wyandotte County District Court decision ordering the KDHE to issue to appellee, Bethany Medical Center (Bethany), a certificate of need for a six megavoltage linear accelerator. Providence-St. Margaret Health Center (Providence-St. Margaret), an intervenor, also appeals.

Some background material may be helpful. A 6 megavoltage linear accelerator is a machine designed for the treatment of cancer by radiation. There are three recognized methods of treating cancer: surgery, chemotherapy and radiation therapy. Radiation therapy is often prescribed for a number of reasons. It may cure the patient, it may alleviate the pain or it may cause remission of the disease. Frequently two or all three methods of treatment are required for the same individual suffering from cancer. Bethany is a general purpose hospital located in Kansas City, Kansas, which treats an extensive number of cancer pa-

tients. The record indicates that 5% of all cancer cases diagnosed in the entire state of Kansas are diagnosed at Bethany. Bethany is now capable of providing only two of the three recognized, and often essential, methods of treatment; that is, surgery and chemotherapy. Patients who require radiation therapy must be treated at the University of Kansas Medical Center (UKMC). Bethany has the physical facilities to accommodate the requested radiation equipment and desires to obtain the 6 megavoltage linear accelerator so that it may better treat and serve its patients and maintain what might be termed a full service oncology (cancer) department. It is Bethany's position that the acquisition of the linear accelerator would not only be beneficial to Bethany and its patients but is necessary for the proper treatment and care of cancer patients in the area serviced by both Bethany and UKMC.

With that brief background we now turn to the administrative procedures involved with Bethany's application. On November 13, 1979, Bethany filed its application with the KDHE, pursuant to K.S.A. 65-4806, for a certificate of need for a 6 megavoltage linear accelerator. As required by K.S.A. 65-4807, a copy of the application was submitted to the Mid-America Health Systems Agency (MAHSA). Various committees of the MAHSA proceeded to conduct hearings and take evidence regarding the application. A public hearing was held on December 18, 1979, in Kansas City, Kansas, and on January 1, 1980, the report of the board of directors of the MAHSA was forwarded to the KDHE. The MAHSA's report recommended denial of the certificate of need but because of purported use of evidence outside of the record, the secretary of the KDHE ordered another hearing before a hearing officer. The hearing was conducted on Friday, February 22, 1980, and on Monday, February 25, 1980, the hearing officer's report along with the secretary's order denying the certificate of need were issued. Bethany then filed a request for a hearing before the Kansas Corporation Commission (KCC) pursuant to K.S.A. 65-4809. A hearing officer appointed by the KCC heard oral arguments on April 14, 1980, and closed the hearing record on May 1, 1980, after receiving all items and documents to be included in the record. On June 30, 1980, the KCC issued its order disapproving the action of the KDHE and directed that a certificate of need be issued. The KDHE appealed the KCC's

decision to Wyandotte County District Court pursuant to K.S.A. 65-4816 and on December 8, 1980, the district court affirmed the ruling of the KCC. The KDHE now seeks to have the district court's decision affirming the KCC's order that directs the KDHE to issue a certificate of need reversed.

The Kansas health planning and development act, K.S.A. 65-4701 *et seq.*, and its application to health facilities such as Bethany, K.S.A. 65-4801 *et seq.*, have been considered in a number of recent cases. The goals of the act are summarized by this court in *Kansas Dept. of Health & Environment v. Banks,* 230 Kan. 169, 630 P.2d 1131 (1981), as follows:

"[T]he goals of such legislation and the required procedures for the granting of a certificate of need include the identification and discontinuance of duplicative or unneeded health services and facilities, and the adoption of policies (1) to contain the rapidly rising costs of health care delivery, (2) to insure more appropriate use of health care services, and (3) to promote greater efficiency in the health care delivery system." p. 170.

In determining the need for any particular request which falls within the certificate of need program, we stated in *Banks:*

"In considering the need for a project, KDHE must apply certain 'interim review criteria' established by the Statewide Health Coordinating Council under the authority granted by K.S.A. 65-4804. The five review criteria or standards to be considered are community need, quality of care, community support, financial feasibility, and cost containment. The evaluation of any proposed health care project against the review standards requires considerable expertise in the field of health care economics. The state agencies which participate in the process are bound by law to attempt to implement the national planning goals of containing rapidly growing costs and avoiding duplicative services. Each 'certificate of need' proceeding is an exercise in the inherently inexact science of determining how society's scarce health care resources might best be allocated." p. 171.

The KDHE concedes that the review criteria as to quality of care and community support were fully substantiated by Bethany. However, the KDHE contends that the burden of showing the other three criteria, community need, financing, and cost containment, had not been met by Bethany. The Kansas statutes on health care and planning have been amended numerous times to keep them in compliance with the federal standards and requirements under the national health planning and development statutes, 42 U.S.C. § 300k *et seq.*, and the regulations issued thereunder. The KDHE has adopted the review standards promulgated in the federal regulations. These standards are commonly referred to as the national guidelines. 42 C.F.R.

§ 121.209 sets forth the standards or national guidelines to be applied when new or additional radiation therapy units are sought by a health care facility such as Bethany.

42 C.F.R. § 121.209 provides in part:

"(a) . . . .

"(2) There should be no additional megavoltage units opened unless each existing megavoltage unit in the health service area(s) is performing at least 6,000 treatments per year.

. . . .

"(b) . . . .

"Dedicated special purpose and extra high energy machines which have limited but important applications may not perform 6,000 treatments per year and should be evaluated individually by HSAs [health service agencies] in the development of Health Systems Plans."

It was stipulated that the health service area under consideration consists of Johnson, Wyandotte and Leavenworth Counties and that the existing radiation therapy units in those three counties are to be considered in determining whether Bethany meets the national guidelines. The only other units in the service area are located at the UKMC. It has a cobalt-60 unit, a 6 megavoltage linear accelerator, a 20 megavoltage linear accelerator on order, and a 40 megavoltage linear accelerator. The cobalt-60 and the 6 megavoltage units are considered low energy machines while the 20 and 40 megavoltage units are classified as extra high energy machines. At the time of the hearings the 40 megavoltage unit at the UKMC had just recently been installed and the 20 megavoltage unit had not been received. Consequently no history was available as to the actual use of these two high energy units. Evidence was presented that the UKMC was providing in excess of 14,000 radiation therapy treatments per year. In determining whether Bethany's application meets or exceeds the national guidelines, it is obvious that if only the two low energy units are considered the standards are met, but if 6,000 proposed treatments are assigned to each of the extra high energy units, Bethany falls short of the standards. The findings of the KDHE as set forth in its order denying the certificate of need include:

"(2) There are presently three (3) megavoltage units in Bethany Medical Center's service area. All three units are located at the University of Kansas Medical Center. A fourth unit will be installed at the University of Kansas Medical Center in 1980.

"(3) Section 42 C.F.R. 121.209 of the National Guidelines for Health Planning sets standards for the review of proposed megavoltage radiation therapy units. The Mid-America Health Systems Agency has adopted this standard.

"(4) Section 42 C.F.R. 121.209(a)(2) of the National Guidelines for Health Planning states: 'There should be no additional megavoltage units opened unless each existing megavoltage unit in the health service area is performing at least six-thousand (6,000) treatments per year.'

"(5) The three (3) currently installed megavoltage units at the University of Kansas Medical Center are performing less than a total of 18,000 treatments per year. Further, the fourth unit to be added at the University of Kansas Medical Center in 1980 will increase further the megavoltage therapy capacity of the service area.

"The Secretary adopts Section 42 C.F.R. 121.209(a)(2) of the National Guidelines for Health Planning as the standard for establishing community need for new megavoltage radiation therapy units.

"The Secretary concludes that the standard has not been met by the proposed project and the community need for a linear accelerator at Bethany Medical Center does not exist."

The order of the KCC reversing the order of the KDHE defines the issue to be determined as:

"The parties to this appeal have stipulated, and the record on appeal provides, that there is but one substantive issue for determination by the Commission in this matter: is the Secretary of the KDHE's decision to *not* consider two of the four radiation therapy units now at the University of Kansas Medical Center as 'dedicated special purpose' machines, supported by substantial evidence on the record?"

The intervenor Providence-St. Margaret does not concede that the issue is so limited as will be brought out later in this opinion.

The KDHE denied Bethany's application for a certificate of need for the sole reason that there was no positive evidence that the 40 megavoltage unit recently installed at UKMC or the 20 megavoltage unit which was to be installed there in 1980 are dedicated special purpose extra high energy machines. Thus if you count the 40 megavoltage unit there would have to be in excess of 18,000 treatments annually to meet the standards and if you count the 20 megavoltage unit to be installed, the figures skyrocket to 24,000 treatments annually as a minimum require-ment before another unit could be approved for the area. The KDHE ignored the national guidelines which recommend that the 20 and 40 megavoltage units be evaluated individually and, having done so, contends Bethany did not carry its burden of proof. Bethany on the other hand contends that the national guidelines are explicit in that dedicated special purpose and extra high energy machines are not to be considered as able to perform 6,000 treatments per year and, if counted at all, must be individ-

ually evaluated. No such evaluation was made by the MAHSA as specified in the national guidelines or by the KDHE.

Before looking at the evidence as disclosed by the record, we need to consider the administrative decision subject to review. The KDHE contends that it is its decision which the district court and this court must review while Bethany contends it is the final administrative decision, that is the decision of the KCC, which is subject to appellate review. The disagreement arises due to the fact that the KCC did not agree with the KDHE in its conclusions as to what was supported by substantial evidence. In *Banks* we again set forth the scope of review to be applied to administrative decisions considered upon appeal in the district court and the appellate courts where the statutes specify there will be no *de novo* review. We need not repeat here what we said in *Banks*. KDHE appears to concede that there is substantial evidence to support either its findings or the findings of the KCC depending upon which order is the subject of review. We held in *Banks* that it is the decision of the KCC, the final administrative tribunal, which is subject to appellate review. That determination is borne out by the statutes and the federal regulations and guidelines.

42 C.F.R. § 123.407 sets forth the procedures which shall be followed by the state agencies in order to comply with the federal standards. K.S.A. 65-4801(c) designates the secretary of health and environment as the state agency and 65-4801(f) defines review agency as "the statewide health coordinating council or other agency designated by the governor."

42 C.F.R. § 123.407(10) provides in part:

"[The procedures adopted by a state agency shall include:] Provision that any decision of the State agency . . . shall, upon request of the person proposing the new institutional health service, be reviewed, . . . by an agency of the State (other than the State Agency) designated by the Governor."

In compliance with the regulations and K.S.A. 65-4801(f) the Governor has designated the KCC as the review agency. K.S.A. 65-4809 provides that a final decision of the state agency may be appealed to the review agency. K.S.A. 65-4812 provides that the hearing before the review agency "shall be on the record and shall not be a *de novo* hearing."

K.S.A. 65-4814(a) provides:

"*The decision of the review agency shall set forth the findings of fact and a determination of the issue presented and may approve or disapprove the decision*

*of the state agency.* Any decision of the review agency directing the state agency to issue a certificate of need shall be subject to lawful conditions prescribed by the state agency which are made applicable by rules and regulations of the state agency to all certificates of need." (Emphasis added.)

K.S.A. 65-4816 provides that the decision of the review agency may be appealed to the district court which *"shall have the jurisdiction to affirm, modify, vacate or reverse the decision of the review agency being appealed."* Thus it becomes readily apparent that the administrative decision subject to review under both the federal regulations and our statutes is the decision of the review agency; in this case the KCC. See also *Kansas Dept. of Health & Environment v. Banks,* 230 Kan. 169.

We now turn to the record to determine whether there is substantial evidence to support the decision of the KCC. At the outset it should be pointed out that the KDHE has, in all candor, conceded at all stages of these proceedings that if the 20 and 40 megavoltage machines are excluded from consideration then Bethany has produced evidence exceeding the national guidelines and should be granted the requested certificate of need. The Hon. Cordell D. Meeks, Sr., now retired, in a detailed and lengthy memorandum opinion set forth extensive findings of fact and conclusions of law. The learned trial court stated in part:

"Findings on Judicial Review
"In the proceedings before KCC, the parties stipulated and took the position that the only substantial issue to be determined was whether the 20 and 40 MeV units of K.U.M.C. should be counted in determining whether the 'National Guidelines' for Radiation Therapy (42 C.F.R. 121.209) had been met. On behalf of KDHE, Mr. Shelton stated: 'I do agree that if you don't count these two machines the criteria would be satisfied'. On this issue, KCC determined that these units were extra high energy machines which would be used for special purposes and which therefore should not have been counted in determining whether the guidelines were met. This finding is supported by substantial evidence of record and does not constitute arbitrary or capricious action. The finding is supported by the evidence cited by KCC in its memorandum order, page 11. In fact the Court finds no evidence in the record supporting a contrary conclusion.
"II.
"(1) Based on its review of the record, as to the substantive issue presented this court finds that all of the evidence on the subject tends to prove that the 20 and 40 megavoltage units are special purpose machines, and extra high energy machines, that they are designed for specialized treatments beyond the capacities of 6 MeV linear Accelerators and cobalt-60 units; that because of the complexity of the machinery, they require considerable more time to perform treatments than do low energy machines, and therefore cannot perform a comparable volume or number of treatments, that they were not purchased for the purpose of performing

treatments similar to those to be performed by low energy units such as 6 MeV linear Accelerators.

"(2) In consideration of the evidence of record, and the stated purpose and intent of the National Guidelines for Health Planning, as well as the language of Section 121.209—*Radiation Therapy,* thereof, the court concludes on the issue presented, that the 20 and 40 megavoltage linear accelerators in question must be evaluated individually and they should not have been evaluated and counted along with low energy units in the application of the guideline so as to justify a finding that the guidelines were not met.

"III.

"The court further finds on the substantive issue presented according to the stipulations of the parties that since all of the evidence on the subject tended to prove that the 20 and 40 MeV units were special purpose and extra high energy machines with limited applications, the secretary of KDHE arbitrarily disregarded uncontroverted testimony and evidence in its determination otherwise." (Citations to the record omitted.)

We agree with the trial court's findings. James Burris, administrative director of radiology services at Bethany testified, among other things, as to the number of cancer patients diagnosed and treated at Bethany; the physical facilities constructed and available to accommodate the proposed linear accelerator; the need for additional radiation therapy units in the area; and that there are 16,819 potential unmet radiation treatments in the area.

Carl Bogardus, M.D., a recognized expert in the field of cancer research and treatment, was the principal witness for Bethany. Among his other credentials was the fact that he served on the advisory committee that recommended the federal standards and national guidelines. He testified at length as to why the high energy machines cannot be counted in determining whether the national guidelines are met. Among other things he testified the machines are not capable of treating as many patients as the low energy machines; they are designed for special types of cancer treatment and are not practical for the "run of the mill" patient; they require extensive and time-consuming daily adjustment and calibration; they cost four times as much as the lower energy machines and are not feasible or practical for ordinary usage from a monetary standpoint; they require more skilled technicians; and it is physically and financially impractical to use them for low energy type treatments. Dr. Bogardus also testified that in his opinion the two UKMC high energy machines were special purpose machines and would be so utilized by UKMC. He also testified that in his opinion the national guidelines had been met

by Bethany and the certificate of need was justified and should be granted.

Evidence was produced that Bethany and UKMC had entered into a contract for UKMC to provide technical assistance and backup to Bethany in the operation of its radiation department. Carl M. Mansfield, M.D., Professor and Chairman, Department of Radiation Therapy at UKMC, supported Bethany's application and indicated the high energy equipment being installed and obtained by UKMC would be available to Bethany "patients that require specialized treatment on the high energy equipment."

Several doctors from the area testified as to the need and advisability of a low energy unit at Bethany. Considerable other evidence supporting Bethany's application appears in the record but we believe the foregoing recitation of a portion of the evidence adequately demonstrates that the decision of the KCC is supported by substantial evidence. In view of our finding it is unnecessary to address the other points raised by Bethany in its appeal.

One other matter needs to be addressed. Providence-St. Margaret, the intervenor, asserts error in the failure of the KCC to consider it as a superior alternative to Bethany  Providence-St. Margaret is caught on the horns of a dilemma. On the one hand it agrees with Bethany that another low energy unit is needed in the three county area but on the other, it asserts Bethany should not have the unit because Providence-St. Margaret might be a more ideal location for a unit to be installed at some undesignated time in the future. The intervenor also contends the KCC did not make its decision within 60 days as required by K.S.A. 65-4814(d). The KCC closed its record on May 1, 1980, and its decision was issued June 14, 1980, well within the statutory period. Both of the arguments of Providence-St. Margaret lack merit.

The judgment of the trial court upholding the decision of the KCC is affirmed.

FROMME, J., not participating.