No. 54,539

IN THE MATTER OF THE REVIEW OF THE DECISION OF THE KANSAS CORPORATION COMMISSION GRANTING A CERTIFICATE OF NEED TO PROVIDENCE-ST. MARGARET HEALTH CENTER OF KANSAS CITY, KANSAS, FOR A SIX-MEGAVOLT LINEAR ACCELERATOR.

(659 P.2d 199)

Opinion filed February 19, 1983.

*David K. Fromme,* of Weeks, Thomas & Lysaught, Chartered, of Kansas City, argued the cause, and *Leonard O. Thomas,* of the same firm, was with him on the briefs for the appellant Bethany Medical Center.

*Robert A. DeCoursey,* of Kansas City, argued the cause and was on the brief for the appellee Providence-St. Margaret Health Center.

*Emily E. Cameron,* special assistant attorney general, was on the *amicus curiae* brief for the Kansas Department of Health and Environment.

The opinion of the court was delivered by

FLOYD H. COFFMAN, District Judge, Assigned: This is an appeal from the order of the trial court sustaining the order of the Kansas Corporation Commission (KCC) which reversed the Secretary of the Kansas Department of Health and Environment's (KDHE or Secretary) Order Denying Certificate of Need on the application of Providence-St. Margaret Health Center (applicant) for a 6 megavolt linear accelerator (6 MeV). The principal respondent through these proceedings has been the Bethany Medical Center (Bethany). There was no appearance in the district court or before the supreme court by either of the administrative agencies. The Secretary participated by oral argument in the proceedings before KCC but did not file a brief or argue in the trial

court, nor in the appellate courts prior to filing an *amicus curiae* brief on January 11, at 4:01 p.m., the afternoon before oral argument before this court.

A review of the factual situation will be helpful. A 6 megavoltage linear accelerator is a machine designed for the treatment of cancer by radiation. There are three recognized methods of treating cancer: surgery, chemotherapy and radiation therapy. Radiation therapy is often prescribed for a number of reasons. It may cure the patient, it may alleviate the pain or it may cause remission of the disease. Frequently two or all three methods of treatment are required for the same individual suffering from cancer. The applicant is a general purpose hospital located on the western edge of Kansas City, Kansas, in Wyandotte County, which treats an extensive number of cancer patients. The applicant, Providence-St. Margaret, is now capable of providing only two of the three recognized, and often essential, methods of treatment; that is, surgery and chemotherapy. Patients requiring radiation therapy are treated at the University of Kansas Medical Center (UKMC) or at other hospitals equipped to do so. The project would involve approximately 6,000 square feet of new construction and the purchase of a 6 MeV linear accelerator at a total cost of approximately 1.75 million dollars. Patients who require radiation therapy must now be treated at UKMC or other facilities within the area depending on the desires of the patient and the attending physician by 6 MeV or other similar units, including, when installed, the unit authorized for Bethany in *In re Bethany Medical Center,* 230 Kan. 201, 630 P.2d 1136 (1981). The applicant hospital is located some ten miles from Bethany and eighteen miles from UKMC through the urban and inner-city areas.

It is the applicant's position that the acquisition of the 6 MeV linear accelerator would not only be beneficial to Providence-St. Margaret and its patients but is necessary for proper treatment and care of other cancer patients in the service area defined by the application.

With that brief background we now turn to the procedures involved with the application. On December 24, 1980, applicant filed with KDHE, pursuant to K.S.A. 65-4806, for a Certificate of Need (CON) for a 6 MeV. As required by statute a copy of the

application was next submitted to Mid-America Health Service Agency (MAHSA). Various committees of MAHSA proceeded to study and process the application. An evidentiary hearing on this application was held before the MAHSA special committee of three persons on March 23, 1981, following which it was disapproved by a vote of one to two. The vote for approval was by Dr. Ben Throne, chief of radiation therapy at Research Hospital, Kansas City, Missouri. At a hearing scheduled for April 9, 1981, the Resources Development Committee of MAHSA, meeting without a quorum (4 of 15 members being present), approved, by consensus, the recommendation of the special committee to deny the issuance of a CON. On April 23, 1981, after considering information and evidence heard by the special committee on March 23, and other information accumulated by the staff in accordance with the regulations of MAHSA, and the thorough 10-page report of the staff recommending disapproval, the MAHSA board of directors in its final action voted to approve the application, with a variance, by a vote of 12 to 5 with 1 abstention and the chair not voting. An April 24, 1981, letter from the Executive Director of MASHA to the Secretary of KDHE included the following explanation:

"The motion of the Board of Directors to recommend approval included the granting of a variance to the Health Systems Plan *based on the applicant's use of a retreatment factor* in determining utilization rates which indicated one additional radiation therapy unit *could* be needed in the MAHSA area." (Emphasis supplied.)

In accordance with health agency procedures, the application was next referred to the Secretary of KDHE. Then Bethany filed a request for a public hearing for the purpose of admitting additional evidence and adding to the record which would be used on any appeal. After a show-cause hearing on May 18, 1981, the hearing officer, by order dated May 20, found that good cause for another public hearing had not been shown by Bethany.

Two days later on May 22, the Secretary of KDHE, in his Order Denying Certificate of Need, made extensive findings summarized in part as follows:

"1. COMMUNITY NEED — The Secretary finds that the project is not needed to continue the satisfactory provision of radiation therapy services in the defined service area, for the reasons set forth below.

"A. *Service Area*" — The "service area of the proposed project is appropriately defined" as follows:

1. The primary service area of the project consists of Wyandotte, Leavenworth, Atchison, Douglas, Franklin, Jefferson, and Miami Counties and 31% of Johnson County with a projected population of 462,340 in 1985.

2. The secondary service area is defined as the balance of Johnson County plus Buchanan and Platte Counties in Missouri with population by 1985 of 337,784.

"B. *Health Problem and C. Health Care System* The . . . existing radiation therapy services are adequate to assure the availability and efficiency of radiation therapy services in the defined service area, for the following reasons."

1. Applicant claimed there would be 1658 new cancer cases in the primary area by 1985. Assuming 50 to 60% of new cancer cases need radiation therapy and 25% *need retreatment* later, the sponsor estimated 998 to 1,198 patients would require therapy by 1983. A recent study by National Cancer Institute (NCI) estimated the *retreatment factor to be 33%,* which applicant maintained is proper.

2. The 1985 projected population of 462,340 at 150,000 persons per unit would by that standard require slightly over three radiation therapy units.

3. Using 1658 new cancer cases estimated for 1985 and a conservative 50% assumed to benefit from radiation, there will be 829 new cases requiring radiation therapy by 1985. Just under three units would be needed to meet the standard of 300 cases per unit per year.

4. Utilizing MAHSA's method of calculation, the National Guidelines for Health Planning, a 33% retreatment factor, and three new cancer cases per year per 1,000 population, the need for sponsor's primary service area is calculated (by KDHE) to be as follows:

"New cancer cases 1985 - (3 x 462,340) ÷ 1,000 = 1,387
 x 50% in need of radiation therapy = 694
 x 33% retreatment factor = 923
 x 20 treatments per regimen = 18,460
 adjusted for 22% in-migration = 22,521
 ÷ 6,000 minimum # of treatments/unit = 3.75
"Thus a need for 3.75 units is demonstrated for the service area."

The secretary found that "the 22% factor of in-migration" from

population outside applicant's primary service area is "highly inflated" due to failure to estimate similarly out-migration for treatment beyond the service area claimed by the applicant.

"5. There are currently four megavoltage units in the sponsor's defined primary service area. . . .

"6. The four units performed a total of 19,963 procedures during 1980, as follows: Cobalt 60 unit, 8,605 procedures; 6 megavolt linear accelerator, 6,172 procedures; 20 megavolt linear accelerator, 1,578 procedures; and 40 megavolt linear accelerator, 3,608 procedures. . . . The 20 megavolt unit was installed in August of 1980 and, therefore, operated only five months during that year. If the 1,578 total procedures which it performed during the last five months of 1980 were annualized, the unit would have performed 3,787 procedures during 1980. Therefore, neither the 20 megavolt linear accelerator nor the 40 megavolt linear accelerator at the University of Kansas Medical Center are currently meeting the guideline of 6,000 procedures per year set forth in the National Guidelines for Health Planning.

"7. There is insufficient evidence in the record to determine whether or not the two high megavoltage units at the University of Kansas are dedicated to a special purpose."

(Findings number 5, 6 and 7 of the Secretary of KDHE, quoted at length above, were criticized by the ultimate review agency, KCC, and by the trial court in arriving at a decision to approve the application which the Secretary had disapproved.)

"II *Cost Containment* — The Secretary finds that the proposed project does not promote cost containment."

A. *Cost-Effective Alternatives* The Secretary found that "a cost-effective alternative to the proposed project exists through full utilization of the megavoltage unit capacity of the University of Kansas Medical Center" in that 19,963 procedures required in 1980 were performed by UKMC's four units with an average of fewer than 5,000 per unit.

B. *Patient Charges* The Secretary found that based on four units, or equivalent, being available in the designated service area, "implementation of the proposed project would have an inflationary effect on the charges of health facilities providing similar services in the area," and that therefore adding another unit by granting the application would "have a negative impact on the utilization of the units at the University of Kansas Medical Center and, therefore, a negative impact on patient charges."

Following the Secretary's Order Denying Certificate of Need, an appeal was filed May 29, with the erstwhile review agency, the Kansas Corporation Commission.

The proceedings before KCC consisted of the oral argument before a hearing examiner on June 29. KCC, as review agency, reversed the Secretary of Health and Environment and ordered the CON be issued by its order dated September 4, 1981, which at the outset summarized the issues, listed the appearances, and in findings numbered one through ten reviewed the path of this application through the agencies much as set out earlier in this opinion. Findings 11, 12 and 13 of the KCC order were:

"11. The findings for review by the KCC are those set forth by the Secretary in the Order of May 22, 1981, denying Applicant a Certificate of Need, in which the Secretary found that Applicant failed to meet the review objectives adopted by the Statewide Health Coordinating Council for Community Need and for Cost Containment.

"The Secretary's findings that Applicant failed to meet the criteria for Community Need and for Cost Containment depend upon the validity of the conclusion, made throughout the Order, that the two high megavoltage radiation therapy units at the University of Kansas either may not be *or are not* dedicated to a special purpose (and thus may be expected to perform as many annual treatments as the low voltage units at Applicant's service area). We find, however, that: the evidence in the record regarding the use of the two high megavoltage units supports a finding that they are dedicated to a special purpose; the evidence is substantial; and the treatment of these units as dedicated to a special purpose is further supported by the Kansas Supreme Court's recent decision in *Kansas Department of Health and Environment v. Bethany Medical Center* (No. 52,849) [*In re Bethany,* 230 Kan. 201].

"We determine that, therefore, the *Secretary's findings that Applicant failed to meet the review objectives* for Community Need and Cost Containment *are not supported by substantial evidence* in the record before the KCC; and that the Secretary's Order in this matter *should be disapproved.* [Emphasis supplied.]

"12. In view of the above finding, it is not necessary for us to address the additional issues raised by Intervenor.

"13. The Kansas Department of Health and Environment should pay the costs of the review and hearing by the KCC in this matter."

The Commission disapproved the order of KDHE and directed the Secretary to issue a Certificate of Need.

The appeal to the district court was filed September 11, 1981, and argued on October 29. Although indicating a desire to decide the case from the bench, the matter was taken under advisement and decided by a letter opinion dated March 4, 1982, stating *inter alia:* "Bethany's claim that the KCC never determined there was a need is completely fallacious. That finding is *implicit* in KCC's granting of the certificate." (Emphasis supplied.) The trial court was in error in considering findings supplied by implication.

In reviewing this case neither the district court nor this court is permitted to try the case de novo and substitute its judgment for that of the Corporation Commission, which was the highest administrative tribunal until the amendments to K.S.A. 65-4801 *et seq.*, effective July 1, 1982, removed the KCC's review authority over administrative appeal. (For current procedure on appeal see *Olathe Community Hospital v. Kansas Corporation Comm'n,* 232 Kan. 161, 652 P.2d 726 [1982].)

In *Kansas Dept. of Health & Environment v. Banks,* 230 Kan. 169, 630 P.2d 1131 (1981), and *In re Bethany,* 230 Kan. 201, the court set forth the scope of review to be applied to administrative decisions considered upon appeal in the district court and the appellate courts, where it is clear there will be no de novo review. In reviewing the district court's judgment, this court, after determining whether the district court observed the restrictions placed upon it, makes the same review of the administrative agency's action as does the district court.

In considering whether the action and order of the administrative tribunal was proper, the district court is restricted to determining: (1) Did it act fraudulently, arbitrarily, or capriciously, (2) was the order supported by substantial evidence, and (3) was the action within the scope of its authority? *Banks,* 230 Kan. at 171-72.

Proper and adequate findings of fact are necessary for an order of an administrative agency to pass muster on review by the

courts. This requirement was succinctly stated in *Blue Cross & Blue Shield v. Bell*, 227 Kan. 426, Syl. ¶ 1, 607 P.2d 498 (1980), as follows:

"An administrative agency must assume the responsibility of expressing the basic facts on which it relies with sufficient specificity to convey to the parties, as well as to the court, an adequate statement of the facts which persuaded the agency to arrive at its decision. Thus, there must be findings on all applicable standards which govern the agency's determination, and the findings must be expressed in language sufficiently definite and certain to constitute a valid basis for the order, otherwise the order cannot stand."

In *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 386 P.2d 515 (1963), this court, at 47, said:

"The findings of the Commission must be based upon facts. It must be possible for the reviewing court to measure the findings against the evidence from which they were educed. Findings not based on evidence, but on suspicion and conjecture, are arbitrary and baseless."

In *Kansas Public Service Co. v. State Corporation Commission*, 199 Kan. 736, 744, 433 P.2d 572 (1967), after repeating the above quote, the court said:

"Moreover, it is equally well settled that the lack of express findings of fact by an administrative agency *may not be supplied by implication (Atchison Ry. v. United States*, 295 U.S. 193, 79 L.Ed. 1382, 55 S.Ct. 748; *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 9 L.Ed.2d 207, 83 S.Ct. 239), and where express findings are required as a matter of procedural law in order to support an administrative determination, it may be stated as a general rule that courts will not search the record in order to ascertain whether there is evidence from which the ultimate finding could be made. (*Wichita R. R. v. Public Util. Comm.*, 260 U.S. 48, 67 L.Ed. 124, 43 S.Ct. 51; *Atchison Ry. v. United States*, supra.) Under our Public Utility Act (K.S.A. Ch. 66) it is the function of the Commission, and not of the court, to find the facts." Emphasis supplied.

See also Note, *Administrative Law: Findings of Fact, A Review of the Federal Administrative Procedure Act and Kansas Law*, 22 Washburn L.J. 58 (1982).

In considering the application of Bethany in *In re Bethany*, 230 Kan. at 203, this court said:

"The Kansas health planning and development act, K.S.A. 65-4701 *et seq.*, and its application to health facilities such as Bethany, K.S.A. 65-4801 *et seq.*, have been considered in a number of recent cases. The goals of the act are summarized by this court in *Kansas Dept. of Health & Environment v. Banks*, 230 Kan. 169, 630 P.2d 1131 (1981), as follows:

" '[T]he goals of such legislation and the required procedures for the granting of a certificate of need include the identification and discontinuance of duplicative

or unneeded health services and facilities, and the adoption of policies (1) to contain the rapidly rising costs of health care delivery, (2) to insure more appropriate use of health care services, and (3) to promote greater efficiency in the health care delivery system.' p. 170.

"In determining the need for any particular request which falls within the certificate of need program, we stated in *Banks:*

" 'In considering the need for a project, KDHE must apply certain "interim review criteria" established by the Statewide Health Coordinating Council under the authority granted by K.S.A. 65-4804. The five review criteria or standards to be considered are community need, quality of care, community support, financial feasibility, and cost containment. The evaluation of any proposed health care project against the review standards requires considerable expertise in the field of health care economics. The state agencies which participate in the process are bound by law to attempt to implement the national planning goals of containing rapidly growing costs and avoiding duplicative services. Each "certificate of need" proceeding is an exercise in the inherently inexact science of determining how society's scarce health care resources might best be allocated.' p. 171."

Neither the findings of the Secretary nor the order of the Commission refer to the review criteria of quality of care, community support, and financial feasibility. They would therefore appear to be supported in the proposed project. However, the Secretary of KDHE, by his findings after consideration of the availability of three 6 MeV units, including one authorized at Bethany, and the equivalent of the fourth unit supplied by the 20 MeV and 40 MeV units at UKMC, establishes that criteria for community need and cost containment are not met by the applicant. The State statutes on health care and planning have been kept in compliance with the standards under the national health planning statutes, 42 U.S.C. § 300k *et seq.* and regulations issued thereunder. These standards, adopted by KDHE, are commonly called the national guidelines. The "standards," or guidelines, for a new, or additional, radiation therapy unit for a health care agency, such as is requested, are set out in 42 C.F.R. § 121.209, p. 192, as follows:

"(a) *Standard.* (1) A megavoltage radiation therapy unit should serve a population of at least 150,000 persons and treat at least 300 cancer cases annually, within three years after initiation.

"(2) There should be no additional megavoltage units opened unless each existing megavoltage unit in the health service area(s) is performing *at least* 6,000 treatments per year.

"(3) Adjustments downward may be justified when travel time to an alternate unit is a serious hardship due to geographic remoteness, based on analyses by the HSA." (Emphasis supplied).

The "Discussion" relating to the rationale for these standards concludes:

"Dedicated *special purpose and extra high energy machines* which have limited but important applications may not perform 6,000 treatments per year and should be *evaluated individually* by HSAs in the development of Health Systems Plans." 42 C.F.R. at 193. (Emphasis supplied).

The only finding by any of the administrative agencies regarding geographical accessibility appears in the report of the board of directors of MAHSA. Finding No. 25, page 7 of that report, reads:

"25. MAHSA travel-time studies indicate that Applicant does not have any special status in regard to geographical accessibility for the proposed project."

It is clear that the review agency (KCC) and the trial court agree with the Secretary of KDHE as to the two general purpose units in use at UKMC in 1980:

(1) The Cobalt unit which performed 8,605 procedures or treatments, and

(2) The 6 MeV unit which performed 6,172 procedures.

On the other hand, KCC and the trial court overlooked, or disregarded, the 20 MeV unit which was installed in August and performed 1,578 procedures by December 31, 1980, and would perform 3,787 on an annualized basis, and the 40 MeV unit which performed 3,608 procedures.

When "individually evaluated" as required by the national guidelines, the 20 MeV and 40 MeV units, although adapted to a special purpose, would together perform 7,395 (3,787 + 3,608) procedures or in excess of the 6,000 procedures required for each 6 MeV unit or equivalent. Together these two units provide the equivalent of a third general purpose radiation unit at UKMC. With the 6 MeV unit approved for installation at Bethany Medical Center, the primary service area defined by the applicant is supplied with two 6 MeV units at UKMC and one at Bethany, plus the equivalent of a fourth unit supplied by the special purpose (20 and 40 MeV) units at UKMC.

It is clear from the standard or national guidelines quoted above, as applied to the findings of the Secretary after considering the two 6 MeV's at UKMC plus the equivalent of a third plus the 6 MeV unit at Bethany, that there are available sufficient units to serve needs of the population in primary service areas defined in the application. The Corporation Commission erred

in holding that the Secretary's findings that the applicant failed to meet the objective for community need and cost containment are not supported by the record before the Commission. The order of the Corporation Commission should therefore be disapproved and the application for a Certificate of Need be denied as recommended and approved by the Secretary of KDHE.

The units at UKMC were discussed in *In re Bethany*, 230 Kan. at 204, in considering whether Bethany met the national guidelines. The court considered the Cobalt-60 and the 6 MeV units as low energy, or general purpose, and more efficient radiation therapy treatment units. These two units were so considered by KDHE in denying the current application. Regarding the Bethany application, a public evidentiary hearing was held December 18, 1979, before a MAHSA committee; and on February 22, 1980, a second hearing was held before a hearing officer of KDHE. The court in *In re Bethany*, observed that:

"At the time of the hearings the 40 megavoltage unit at the UKMC had just recently been installed and the 20 megavoltage unit had not been received. Consequently no history was available as to the actual use of these two high energy units." 230 Kan. at 204.

Later the court observed, bottom of page 205, that "KDHE ignored the national guidelines which recommend that the 20 and 40 megavoltage units be evaluated individually." The 1980 statistics were not available and in the record for an evaluation of the capacity of these high-megavoltage units when the Bethany application was being considered in this court, and the decision of the trial court approving the decision of the KCC to disregard the 20 and 40 MeV units in counting the general purpose, low megavoltage units was sustained.

Although the population in the primary service area of the proposed project was estimated at 447,428 in 1980 and projected to be 462,340 in 1985, applicant projected before the MAHSA board the need for thirteen radiation therapy units by 1985 to serve a population for the larger area of nearly 1,391,000. By this method applicant argued, by use of flip charts, before KCC and the trial court, that sufficient treatments would be anticipated by 1985 to require 5.2 radiation therapy units and with the three units and equivalent at UKMC and one authorized for Bethany, there remains a need for 1.2 units which would be supplied by the proposed project. Applicant used the same charts in arguing

before this court. Upon inquiry during argument, applicant acknowledged that the projections shown on the charts had not been adopted in the findings of any of the administrative agencies. In the district court, the offer of this flip chart was received by the trial judge for the limited purpose of permitting applicant to rebut Bethany's suggestion that MAHSA did not consider the fact that Bethany would probably be getting a machine. The trial judge acknowledged he knew nothing about who made up the flip charts or what information was used in their preparation. Since they were not received as part of the record before MAHSA, the charts could not be received in evidence for what they purported to show under the restrictions on the review by the trial court. Since this court makes the same review of the administrative tribunal's action as does the district court, the use of those charts in this court is not authorized. *Kansas State Board of Healing Arts v. Foote,* 200 Kan. 447, 451, 436 P.2d 828 (1968). The only finding in this record regarding population, cancer cases, and required treatments appears in the Secretary's Order Denying Certificate of Need referred to and summarized above in Section B, 4 which finds a need for 3.75 radiation therapy units in the service area defined by applicant in the project.

As discussed above, the individual evaluation of the high megavoltage, 20 and 40, units should have been considered by the review agency, KCC, in determining the current application. Also, the approval of the 6 MeV unit at Bethany by this court in *In re Bethany,* 230 Kan. 201 (decided July 17, 1981), should have been acknowledged by KCC in its order dated September 4, 1981, and judicially noticed by the trial court. This procedure would have been consistent with the goals and guidelines of the Kansas Health Planning and Development Act and the national guidelines for authorizing additional radiation therapy units. The nature of the standards and procedures set out in the national health planning statutes indicate the need for consideration of as current information as is feasible and proper.

The disposition being made makes it unnecessary to discuss other issues which were raised in the briefs and considered by the court. The decision of the trial court is reversed on the grounds that it erred in approving the KCC holding that there was insufficient evidence in the record before the Secretary of KDHE to support a finding that applicant failed to meet the

review objectives for community need and cost containment. The case is remanded to the trial court with directions to deny the application for a Certificate of Need.