No. 89,075

BLUE CROSS AND BLUE SHIELD OF KANSAS, INC., *Appellee/Cross-Appellant,* v. SANDY PRAEGER in her official capacity as Commissioner of Insurance for the State of Kansas, *Appellant/Cross-Appellee,* and ANTHEM INSURANCE COMPANIES, INC., *Appellee/Cross-Appellant,* v. SANDY PRAEGER in her official capacity as Commissioner of Insurance for the State of Kansas, *Appellant/Cross-Appellee.*

(75 P.3d 226)

YALE LAW LIBRARY

Opinion filed August 6, 2003.

*Dan Biles,* of Gates, Biles, Shields & Ryan, P.A., of Overland Park, Kansas, argued the cause, and *Brent Getty,* of Kansas Insurance Department, was on the briefs for appellant/cross-appellee Commissioner of Insurance for the State of Kansas.

*Gary D. McCallister,* of Gary D. McCallister & Associates, Ltd., of Chicago, Illinois, argued the cause, and *Eric I. Unrein,* of Davis, Unrein, McCallister, Biggs & Head, L.L.P., of Topeka, *William H. Pitsenberger,* general counsel, of Blue Cross and Blue Shield of Kansas, Inc., of Topeka, *Sidney A. Shapiro,* of Lawrence, and *James C. Scoville* and *Carl Micarelli,* of Debevoise & Plimpton, of New York, New York, were with him on the briefs for appellee/cross-appellant Blue Cross and Blue Shield of Kansas, Inc.

*Kevin M. Fowler,* of Frieden, Haynes & Forbes, argued the cause, and *Randall J. Forbes* and *John C. Frieden,* of the same firm, were with him on the briefs for appellee/cross-appellant Anthem Insurance Companies, Inc.

*Ross S. Myers,* of Kansas City, Missouri, was on the brief for *amicus curiae* National Association of Insurance Commissioners.

*Dawn Touzin,* of Boston, Massachusetts, was on the brief for *amicus curiae* Community Catalyst, Inc.

*Douglas Laird,* and *William W. Sneed,* of Polsinelli, Shalton, & Welte, P.C., of Topeka, were on the brief for *amicus curiae* Kansas Medical Society.

*Charles R. Hay* and *Steve A. Schwarm,* of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, were on the brief for *amicus curiae* Kansas Hospital Association.

*Per Curiam*: These appeals arise out of proceedings wherein Kathleen Sebelius, Kansas Commissioner of Insurance, denied the request by Anthem Insurance Companies, Inc. (Anthem), to acquire health insurance company Blue Cross and Blue Shield of Kansas, Inc. (BCBSKS). Anthem and BCBSKS then filed petitions for judicial review with the Shawnee County District Court based

on five different reasons under K.S.A. 77-621 of the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA). The district court reversed the Commissioner's decision on the single issue of an erroneous application or interpretation of the law and declined to rule on the remaining issues presented. The Commissioner appealed, the other parties cross-appealed, and the case was transferred to us from the Court of Appeals on the Commissioner's motion. Our jurisdiction is pursuant to K.S.A. 20-3017.

For the reasons set forth in the opinion, we disagree with the district court's narrowly based decision and reverse. Under our obligation to make the same review of the administrative agency's actions as does the district court, and pursuant to our review under K.S.A. 77-621, we will address the questions asked of the district court which it left unanswered. Those KJRA issues, and this court's accompanying holdings, are as follows:

1. Did the Commissioner erroneously interpret and apply K.S.A. 40-3304 of the Kansas Insurance Holding Companies Act ("the acquisition statute")? No.

2. Did the Commissioner act beyond the jurisdiction conferred by the acquisition statute? No.

3. Is the Commissioner's order unreasonable, arbitrary, or capricious? No.

4. Is the Commissioner's order based on a determination of fact that is not supported by substantial evidence when viewed in light of the record as a whole? No.

5. Are K.S.A. 40-3304(d)(1)(C) and (E) unconstitutional delegations of a legislative function under Art. 2, § 1 of the Kansas Constitution? No.

See K.S.A. 77-621(c)(1), (2), (4), (7), and (8).

Consequently, the judgment of the district court is reversed, and the Commissioner's order is affirmed. The cross-appeals of Anthem and BCBSKS, based upon an alleged erroneous remand to the Commissioner by the district court, are rendered moot.

## FACTS

### The Companies' Backgrounds

BCBSKS evolved from two nonprofit service corporations, Blue Cross of Kansas and Blue Shield of Kansas, which were formed in the 1940's. Consolidation of the two companies in 1983 created BCBSKS. In 1992, BCBSKS terminated its nonprofit status and became a mutual insurance company. In order to extinguish its charitable obligations, BCBSKS made a one-time special payment of approximately $75 million for charitable purposes which was judicially approved.

Today BCBSKS is the largest health insurer in Kansas, with a 67% market share in the areas in which it operates. BCBSKS provides or administers private health care coverage for more than 715,000 Kansas residents in all Kansas counties except Johnson and Wyandotte. In addition, BCBSKS administers Medicare and Medicaid health care coverage for another 640,000 Kansans.

In 2000, BCBSKS had premiums of $873 million, surplus of $328.5 million, net income of $5.8 million, and assets of $730.8 million. For the 6 months ended June 30, 2001, BCBSKS had premiums of $484.1 million, surplus of $310.4 million, net loss of $14.4 million, and assets of $698.1 million.

Anthem developed from a mutual insurance company known as Blue Cross of Indiana. In 1985, Blue Cross of Indiana merged with the mutual insurance company known as Blue Shield of Indiana to create a company called Associated Insurance Companies, Inc. (Associated).

Associated began a series of mergers and acquisitions in 1993 with the merger of Blue Cross and Blue Shield of Kentucky into Associated. In 1995, Community Mutual Blue Cross and Blue Shield of Ohio was merged into Associated. In 1996, Associated changed its name to Anthem Insurance Companies, Inc. In 1997, Blue Cross and Blue Shield of Connecticut, Inc., was merged into Anthem. In 1999, Anthem purchased Blue Cross and Blue Shield of New Hampshire and Blue Cross and Blue Shield of Colorado and Nevada. In 2000, Anthem purchased Blue Cross and Blue Shield of Maine.

In 2001, Anthem converted from a mutual insurance company to a stock insurance company. Anthem became a wholly owned subsidiary of Anthem, Inc., which was created as a public holding company for the Anthem companies.

In 2000, Anthem had revenues of $8.7 billion, surplus of more than $1.9 billion, net income of $226 million, and assets of $5.7 billion. For the 6 months ended June 30, 2001, Anthem had revenues of $5.1 billion, surplus of more than $2 billion, net income of $143 million, and assets of $5.8 billion.

## Sponsored Demutualization

In May 2001, BCBSKS and Anthem entered into an Alliance Agreement (Agreement) under which Anthem or its designated affiliate would acquire ownership and control of BCBSKS. The Agreement contemplates a two-step transaction, which the parties refer to as a sponsored demutualization. The first step is BCBSKS's conversion from a mutual insurance company owned by its policyholders to a stock insurance company. The second is Anthem's purchase of all shares of common stock authorized and issued by BCBSKS after its conversion. Under the Agreement, Anthem is to pay $190 million for BCBSKS's stock.

The Board of Directors of BCBSKS adopted a formal plan of conversion and submitted it to the Commissioner for approval in October 2001. Anthem filed a "Form A-Statement Regarding the Acquisition of Control of or Merger with a Domestic Insurer" with the Commissioner, seeking approval of its acquisition of BCBSKS.

The applications state that BCBSKS would convert to a stock company upon the approval of the Commissioner and BCBSKS policyholders eligible to vote, as determined under the Plan (Eligible Policyholders). Conversion would extinguish all policyholders' membership interests. Eligible Policyholders would receive a special cash distribution from BCBSKS limited to the amount by which BCBSKS's book value upon conversion exceeds $155 million. This specific amount was later calculated as $131 million.

In addition to the $131 million, Eligible Policyholders also would receive $142 million of the $190 million purchase price paid by Anthem. The remaining $48 million of the purchase price would

be deposited into an escrow fund pending resolution of the Contingent Litigation Matter. Any money left in the escrow fund after that resolution and satisfaction of certain related liabilities would be distributed to Eligible Policyholders. This proposal eventually was approved by the required percentage of Eligible Policyholders.

BCBSKS engaged Dresdner Kleinwort Wasserstein, Inc. (DKW), an investment firm, to evaluate whether the total consideration to be distributed to Eligible Policyholders under the Agreement was equitable. DKW concluded that, from a financial point of view, the aggregate of the purchase price and the special distribution to be paid to Eligible Policyholders was fair. BCBSKS also engaged the actuarial firm of Milliman, USA, to devise an equitable method of allocating consideration to Eligible Policyholders.

The Commissioner considered the applications as a single transaction and consolidated them for further proceedings. To assist in her review, she formed a Kansas Insurance Department Testimonial Team (KID testimonial team) which consisted of independent special counsel and advisors as well as members of her staff. The Commissioner also held public comment meetings in five locations throughout the state. The examination process covered a period of several months, involving attorneys, investment bankers, actuaries, tax specialists, certified public accountants, and health care and planned development specialists.

The Commissioner presided over a public evidentiary hearing in Topeka from January 7-9, 2002. On February 11, 2002, she issued a 45-page final order containing 66 findings of fact and 8 conclusions of law which addressed all issues of conversion and acquisition. Her decision was governed by the conversion statutes, K.S.A 40-4001 *et seq.*, and the Kansas Insurance Holding Companies Act, K.S.A. 40-3301 *et seq.*

## The Commissioner's Findings and Order

Among other things, the Commissioner found that the proposal for consideration and allocation was fair to Eligible Policyholders. She also found that the sponsored demutualization would not result in any compensation, stock, or other benefit to any person associated with BCBSKS, and that BCBSKS executive officer compen-

sation would not change as a result of the sponsored demutualization. She further found that BCBSKS has been able to recruit and retain sufficient competent staff and management. She also found that Anthem intends to offer employment to all persons employed by BCBSKS upon its acquisition of BCBSKS, but the employment will not necessarily be in Kansas. According to the Commissioner, however, the sponsored demutualization would not produce significant economies of scale. Nor would it lessen BCBSKS's exposure to local events. The combined Anthem companies would be subject to local events in nine states rather than only in Kansas.

The Commissioner further found that BCBSKS had accumulated a considerable surplus, which had allowed it to operate without maximizing its underwriting margins and thereby to hold down premium rates. She also found that BCBSKS intended to reduce the $286 million surplus to $155 million. She additionally found that not only would Anthem fail to restore the $131 million reduction, but it would also further reduce the surplus dedicated to Kansas policyholders to approximately $90 to $112.5 million because it capitalizes its subsidiaries at substantially lower levels than those maintained by BCBSKS. From this, the Commissioner found that after the sponsored demutualization, BCBSKS policyholders would be protected by a surplus less than half the current amount, so that BCBSKS would be considerably financially weakened by the sponsored demutalization.

The Commissioner also reviewed a report from PricewaterhouseCoopers LLP (PwC), which had been retained by the KID testimonial team to conduct a market impact analysis of the sponsored demutualization to determine likely changes that would occur in the health insurance market in Kansas if the transaction were approved. Toward that end, PwC specifically analyzed choices, availability and cost of insurance coverage, provider contracting arrangements, administrative processes, employment levels in Kansas, and factors likely affecting Anthem's general performance. For its study, PwC requested information from Anthem and BCBSKS, obtained information from the Departments of Insurance in other states in which Anthem operates, interviewed in-

dividuals who represent medical associations and hospital associations in states in which Anthem operates, and reviewed public documents. PwC concluded that with relation to choice, availability and cost of insurance, the levels of insurance that are available today would likely continue, but that there would be premium rate increases significantly higher with the sponsored demutualization than without it. The Commissioner found that PwC "performed the only systematic, analytic review of the Kansas health insurance market" and therefore gave its report substantial weight.

Primarily based upon the PwC report, the Commissioner also found the following, which are primarily compiled from her findings of fact:

54. Due to rising medical costs, health insurance rates will increase whether or not the sponsored demutualization is approved. This increase is referred to as "trend" in the market.

56-59. Over the last 6 years, while operating as a mutual company, BCBSKS had negative underwriting margins of 2 to 3%. While it had projected it would achieve positive underwriting margins of 0.4% by 2005, its best projection now—due to a worse than expected underwriting performance during 2001—is that it will achieve 0% underwriting margin by 2005.

60-61. As a mutual insurance company, before converting to a stock company in 2001, Anthem achieved positive underwriting margins of 2 to 3%. However, Anthem's primary corporate objective is to match or exceed its top competitor across several criteria, including underwriting margins, and its investor-owned competitors have underwriting margins of 4.5 to 5%.

63-65. As a result of the sponsored demutualization, premium rates will not only increase above "trend," but also will be greater than those increases that would occur under BCBSKS's current management. Premium rate increases would not be uniform across categories of insureds. The premium rates will not increase above trend for large group businesses because it is experience-rated and more competitive than small group and individual markets. Similarly, rates are unlikely to increase, above trend, in the Medicare block of business, because it is already profitable and more competitive than the small group and individual markets.

66. As a result, the premium rate increases will be concentrated in the small group and individual markets, on which BCBSKS is currently losing money. These rates will occur as follows:

—To achieve an increase in underwriting margins from BCBSKS's past 6-year negative 2% to a positive 2.5% (a conservative estimate of Anthem corporate performance) by 2005, Anthem would increase premium rates by 14% above trend.

—And to achieve those underwriting margins of 2.5% by 2005, Anthem's premium rates would be 7% higher than those required to achieve BCBSKS's 0% underwriting projection by 2005.

—Accordingly, BCBSKS premium rates will increase by at least 6% to 7% above the levels that would be expected without the sponsored demutualization.

Although PwC did not analyze the scenario where Anthem would achieve its purported goal of greater underwriting margins (4.5 to 5%) by 2005, the Commissioner found that under those circumstances the premium increases would be significantly higher than the 14% above trend increases which were based upon a 2.5% underwriting goal by 2005.

Although the commissioner found that premiums were only one of five factors which affect, *e.g.*, increase, underwriting margins, she further found that there was insufficient/unpersuasive evidence presented to her to demonstrate strategies that would utilize these other factors to achieve such an increase in the future. Accordingly, she found that this lack of evidence necessarily pointed the analysis toward premium rate increases. These other four factors, and her discussion, follow:

(a) Medical expenses. Reducing medical expenses requires more aggressive contracting with providers than has been BCBSKS's practice. The sponsored demutualization will not reduce BCBSKS's medical costs.

(b) Administrative expenses or overhead. BCBSKS has lower administrative costs than Anthem. BCBSKS's current administrative-expense ratio is approximately 9%. When calculated in a way similar to BCBSKS's calculation, Anthem's current administrative-expense ratio is approximately 11.5%. The administrative-expense ratio of the Anthem West Region is 13.7%, down from 26.8% in

1999. Anthem presented no substantial evidence on how material reductions in BCBSKS's administrative expenses could be achieved.

(c) Membership enrollment. Anthem presented no evidence on how it would materially increase membership in Kansas.

(d) Benefit design. BCBSKS's benefit design will not change as a result of the sponsored demutualization.

From the information presented, the Commissioner concluded that Anthem would severely deplete BCBSKS's surplus to benefit the Anthem holding company and would raise premium rates significantly more than BCBSKS would without the acquisition. This would weaken the financial standing of the state's dominant health insurer and place a substantial/significant financial burden on the BCBSKS's policyholders, the public, and the insurance-buying public. Citing K.S.A. 40-3304(d)(1)(C), she concluded as a matter of law that the proposed sponsored demutualization would cause a material change in management that would be unfair and unreasonable to policyholders and not in the public interest. For these same reasons, the Commissioner also concluded as a matter of law, citing K.S.A. 40-3304(d)(1)(E), that the proposed sponsored demutualization would likely be hazardous or prejudicial to the insurance-buying public. Based on the 66 findings of fact and 8 conclusions of law of the final order, the Commissioner disapproved the proposed sponsored demutualization.

## The District Court

The district court reversed the Commissioner, having distilled the multiple issues presented to it into one, *i.e.*, whether the Commissioner correctly interpreted and applied the law pursuant to K.S.A. 77-621(c)(4). No in-depth review of the record to determine if her findings were supported by substantial evidence was made since the court found such irrelevant to its determinations that her legal interpretations were incorrect. In the court's analysis, however, it did examine the issues of premium increases and surplus reductions as follows:

"1. **Feared increases in premiums**.

"The Commissioner concluded, based upon the 'projections' of her expert, that Anthem, being a for-profit company with a track record of profitability, would

bring the two unprofitable BCBS lines of insurance (small groups and individuals) to profitability perhaps as early as 2005. The existing BCBS business plan calls for similar results, but with a goal date of 2007. The Commissioner also found that Anthem would achieve profitability in these two lines of insurance solely by raising premiums (although there are a variety of ways that could be accomplished, *e.g.*, reduction of medical costs, closer attention to claims, new benefit designs, lower administrative costs, and membership growth). Thus, the Commissioner found that two classes of Kansas policyholders would pay higher premiums sooner (perhaps as much as 2 years) under Anthem. This she declared to be 'hazardous or prejudicial' and/or 'unfair and unreasonable' to Kansas insureds and grounds for denial under K.S.A. 40-3304(d)(1)(C) and (E).

"The difficulty with the Commissioner's position, even assuming the double and triple inferences are factually supported, is that the Kansas Supreme Court has previously held that 'one risk group should not be subsidized at the expense of others.' *Blue Cross & Blue Shield v. Bell*, 227 Kan. 426[, 607 P.2d 498] (1980). Thus, it is contrary to the law of Kansas for an insurance company to use the proceeds from one line of insurance to subsidize another, each line being required to 'stand alone.' When reduced to its simplest terms, the Commissioner has denied this acquisition in the first instance because she fears Anthem will bring the two unprofitable BCBS insurance lines to profitability (and thus within the law) sooner than BCBS itself would do. Obviously, the mere statement of such a proposition reveals its irrationality. To deny an acquisition so that two classes of BCBS insureds (small groups and individuals) can continue to reap unlawful benefits at the expense of other BCBS insureds (the elderly and infirm in Medicare plans) is a proposition so indefensible as a matter of law as to require no further refutation.

## "2. Feared future surplus reductions.

"As with her first justification for denial of the subject acquisition, the Commissioner's second ground likewise runs flatly counter to established Kansas law. With respect to the BCBS surplus, the Commissioner found: (a) some will be distributed to policyholders under the acquisition agreement (with which she took no exception) and (b) based upon her expert's further 'projection,' an additional part of the surplus would likely be reduced by Anthem after the acquisition. In fact, the expert predicted that the further reduction would lower the BCBS surplus to the range of $90 to $112.5 million. This prediction of the expert was based on the 'projections' of what Anthem and other for profit companies 'usually do.'

"Once again, even if one assumes the double and triple inferences of the expert to be factually supported, the argument fails as a matter of law. In K.S.A. 40-2c01 *et seq.*, the Legislature has prescribed the required minimum levels of surplus for insurance companies doing business in Kansas. Even if the Commissioner's worst fears are realized (*i.e.*, if surplus levels are actually reduced to the lowest levels of the projected range), the surplus will still be above the level declared legally sufficient by our Legislature. Again, the Commissioner has denied this acquisition

because she fears Anthem will comply with Kansas law. K.S.A. 40-401, K.S.A. 40-402, and K.S.A. 40-2c01.

"Although the Commissioner is granted power to supervise insurers and to enforce the Kansas Insurance Code (K.S.A. 40-103), she is not authorized to add or change established legal requirements or take regulatory action based upon anticipated premium rates or levels of surplus that would be either required by or consistent with the law under the aforementioned statutory guidelines and case precedents. See *e.g.*, *Mitchell v. Liberty Mut. Ins. Co.*, 271 Kan. 684[, 24 P.3d 711] (2001); *Olathe Community Hospital v. Kansas Corporation Comm'n*, 232 Kan. 161[, 652 P.2d 726] (1982); *Kansans for Fair Taxation, Inc., v. Miller*, 20 Kan. App. 2d 470[, 889 P.2d 154, *rev. denied* 257 Kan. 1092] (1995).

"Finally, if more be needed, it is important to observe that all insurance rate increases and all insurance company surplus distributions are required to be first approved by the Commissioner. (K.S.A. 40-2215 sets forth the public policy the Commissioner must enforce regarding insurance rates. K.S.A. 40-3306 governs dividends that may be distributed from insurance company surpluses.) Accordingly, before the future predicted 'hazardous or prejudicial' and/or 'unfair and unreasonable' rate hikes and surplus reductions could occur, each would first have to be approved and authorized by the Commissioner herself. The Court is unwilling to presume, as a matter of law, that this or any subsequent Commissioner would approve 'hazardous or prejudicial' and/or 'unfair and unreasonable' rates or dividend distributions. Thus, it is not possible for these 'projections' to ever be realized and it is therefore illogical, if not arbitrary and capricious, for the Commissioner to base her denial solely on these 'projections.' "

On June 7, 2002, the district court vacated the Commissioner's order disapproving the acquisition in its entirety and remanded to the Commissioner for further proceedings not inconsistent with its opinion.

## The Commissioner's Appeal

The Commissioner appealed the district court decision, and this we first consider. Essentially, her appeal argues that she correctly interpreted and followed K.S.A. 40-3304(d)(1)(C) and (E) and that the district court's interpretation and decision is erroneous. On February 4, 2003, the Supreme Court granted appellant's motion to substitute parties on appeal to reflect that Sandy Praeger replaced Kathleen Sebelius in her official capacity as Commissioner of Insurance.

Anthem and BCBSKS cross-appealed from the district court opinion to remand the case to the Commissioner. But, as we have

previously stated, based on the result we reach, we need not consider the cross-appeals.

With this background, we now analyze and decide the issues raised on appeal from the Commissioner's orders.

## ANALYSIS

Our standard of review is statutorily defined by the KJRA. *Reed v. Kansas Racing Comm'n*, 253 Kan. 602, 609. 860 P.2d 684 (1993). A court shall grant relief *only* if it determines one or more of the following:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

See *Winston v. Kansas Dept. of SRS*, 274 Kan.396, 403-04, 49 P.3d 1274 (2002).

On appeal, we exercise the same statutorily limited review of the agency's action as does the district court, *i.e.*, "as though the appeal had been made directly to this court." *Winston*, 274 Kan. 396, Syl. ¶ 2; see *Peck v. University Residence Committee of Kansas State Univ.*, 248 Kan. 450, 456, 807 P.2d 652 (1991). The party asserting the agency's action is invalid bears the burden of proving the invalidity. K.S.A. 77-621(a)(1); *Winston*, 274 Kan. at 404. As a result, BCBSKS and Anthem, as the petitioners for review to the district court, retain the burden in this court of proving at least one of the above-listed statutory bases of error exists.

Issue 1: *Did the Commissioner erroneously interpret and apply K.S.A. 40-3304 of the Kansas Insurance Holding Companies Act ("the acquisition statute")?*

a. *Review*

BCBSKS and Anthem first allege that relief from the Commissioner's order should be granted pursuant to K.S.A. 77-621(c)(4) because she erroneously interpreted and applied K.S.A. 40-3304. This statute, which they acknowledge is the acquisition statute, is part of the Kansas Insurance Holding Companies Act, K.S.A. 40-3301 *et seq.* Among other things, the acquisition statute provides that one may not "acquire control of a domestic insurer" without filing with the Commissioner of Insurance a statement containing certain information and receiving approval by the Commissioner pursuant to a manner statutorily prescribed. K.S.A. 40-3304(a). The required information is primarily financial, but may include "such additional information as the commissioner of insurance may by rule or regulation prescribe as necessary or appropriate for protection of policyholders of the insurer or in the public interest." K.S.A. 40-3304(b)(12).

The acquisition statute states in relevant part at 40-3304(d)(1):

"The commissioner of insurance *shall* approve any merger or other acquisition of control referred to in subsection (a) of this section *unless*, after a public hearing thereon conducted in accordance with the provisions of the Kansas administrative procedure act, the commissioner finds that:

"(A) After the change of control the domestic insurer referred to in subsection (a) of this section would not be able to satisfy the requirements for the issuance of a license to write the line or lines of insurance for which it is presently licensed;

"(B) the financial condition of any acquiring party is such as might jeopardize the financial stability of the insurer or prejudice the interests of its policyholders;

"(C) the plans or proposals which the acquiring party has to liquidate the insurer, sell its assets or consolidate or merge it with any person, or to make any other material change in its business or corporate structure or management, *are unfair and unreasonable to policyholders of the insurer and not in the public interest; or*

"(D) the competence, experience and integrity of those persons who would control the operation of the insurer are such that it would not be in the interest of the policyholders of the insurer and of the public to permit the merger or other acquisition of control; or

"(E) *the acquisition is likely to be hazardous or prejudicial to the insurance-buying public.*" (Emphasis added.)

As previously set forth, the Commissioner refused to approve Anthem's acquisition of control of BCBSKS, concluding it was contrary to the standards stated in subsections C and E, as italicized.

As we review allegations that the Commissioner has erroneously interpreted or applied the law, we are guided by the following language in *In re Tax Appeal of Harbour Brothers Constr. Co.*, 256 Kan. 216, 883 P.2d 1194 (1994):

"Interpretation of a statute is a question of law. *Todd v. Kelly,* 251 Kan. 512, 515, 837 P.2d 381 (1992). Special rules apply, however, when considering whether an administrative agency 'erroneously interpreted or applied the law':

'The interpretation of a statute by an administrative agency charged with the responsibility of enforcing that statute is entitled to judicial deference. This deference is sometimes called the doctrine of operative construction. . . . [I]f there is a rational basis for the agency's interpretation, it should be upheld on judicial review. . . . [However,] [t]he determination of an administrative body as to questions of law is not conclusive and, while persuasive, is not binding on the courts.' *State Dept. of SRS v. Public Employee Relations Board*, 249 Kan. 163, 166, 815 P.2d 66 (1991).

Deference to an agency's interpretation is especially appropriate when 'the agency is one of special competence and experience.' *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 246, 834 P.2d 368 (1992). However, the final construction of a statute always rests with the courts. *In re Tax Exemption Application of City of Wichita*, 255 Kan. 838, 842, 877 P.2d 437 (1994)." 256 Kan. at 221-22.

In *Guardian Title Co. v. Bell*, 248 Kan. 146, 154, 805 P.2d 33 (1991), we observed that the insurance commissioner is "an expert in regulation of the insurance industry, with a large staff and paid consultants available. The insurance commissioner is charged with regulating a huge, complex industry." We later observed that:

"The commissioner of insurance is vested by statute with the general supervision, control, and regulation of insurers and has the power to make all reasonable rules and regulations necessary to enforce the laws of the state relating to these matters. K.S.A. 40-103. This includes the making of *reasonable decisions and interpretations* in order to carry out the statutory provisions." (Emphasis added.) *Mitchell v. Liberty Mut. Ins. Co.*, 271 Kan. 684, 700, 24 P.3d 711 (2001).

In *Mitchell,* we also observed that the legal interpretation of a statute by an administrative agency that is charged by the legisla-

ture with the authority to enforce the statute, such as the insurance department in *Mitchell* and the case at hand, is entitled to *great* judicial deference. 271 Kan. 684, Syl. ¶ 4.

In our consideration of the appropriate standard of review, we finally observe that "[i]t is fundamental that where a statute is designed to protect the public, the language must be construed in light of the legislative intent and purpose and is entitled to a broad interpretation so that its public purpose may be fully carried out." *Johnson v. Killion,* 178 Kan. 154,158-59, 283 P.2d 433 (1955). The acquisition statute is replete with references to protecting the public, *e.g.,* K.S.A. 40-3304(b)(12) (require additional information as is necessary or appropriate for the protection of policyholders or in the public interest). Indeed, three of the statute's five bases for the Commissioner's denial of an otherwise appropriate acquisition are of this tenor. See 40-3304(d)(1)(C)(plans or proposals unfair and unreasonable to policyholders and not in the public interest); (d)(1)(D)(acquired company's management not in the interest of policyholders and of the public); and (d)(1)(E) (acquisition hazardous or prejudicial to the insurance-buying public). While the Kansas Insurance Holding Companies Act, *e.g.,* K.S.A. 40-3301 *et seq.,* does permit insurers—pursuant to a declaration of public interest and policy—to perform certain activities for the benefit of themselves and the public, it is clear from (d)(1)(C)-(E) that the legislature's overriding concern in acquisitions is for the Commissioner to protect the public. Protection of the public has long been an important function of the Insurance Commissioner, as evidenced by this court's statement over 60 years ago in *National Mutual Casualty Co. v. Hobbs,* 149 Kan. 625, 633, 88 P.2d 1006 (1939):

"The statutory powers conferred on the commissioner of insurance are necessarily broad and comprehensive. It is a well-known historical fact that in bygone years the people of this state suffered many evils at the hands of unsound and ill-managed insurance companies; and the pertinent legislation dealing with that evil has been a progressive and continuous expansion of the state's supervisory authority over insurance companies which eventually culminated in the enactment of the insurance code of 1927. (G.S. 1935, 40-101 *et seq.*) Indeed, the supervisory powers of the commissioner of insurance have been considerably increased since that enactment, as even a casual examination of our later successive compilations of session laws will reveal."

In light of the foregoing, we will give great deference to the Commissioner's interpretation of the acquisition statute if it has a rational basis. Against this backdrop, we examine the arguments of BCBSKS and Anthem, which can essentially be characterized as an endorsement of the district court's rationale.

b. *Increase in premiums*

In addressing the issue of the Commissioner's concerns about an increase in premiums, the district court relied heavily upon an excerpt from *Blue Cross & Blue Shield v. Bell*, 227 Kan. 426, 439, 607 P.2d 498 (1980), stating that "one risk group should not be subsidized at the expense of others." According to the district court: "Thus, it is contrary to the law of Kansas for an insurance company to use the proceeds from one line of insurance to subsidize another, each line being required to 'stand alone.' " The court then concluded that the Commissioner's order violates this Kansas law because it requires the continued subsidization of small groups and individuals by others, *e.g.*, the "elderly and infirm in Medicare plans." As we will hereafter show, the district court's reading of the Commissioner's order is erroneous and its reliance upon *Bell* is misplaced.

In response to the district court decision, the Commissioner argues that the court—and in turn Anthem and BCBSKS—have misinterpreted her order. She contends that contrary to BCBSKS's specific allegation, and the district court's inherent finding, that she was "commanding" cross-subsidization, she was not. According to the Commissioner, she was merely denying the acquisition because she found Anthem would raise rates significantly higher than BCBSKS would have in order for Anthem to reach its goal of higher underwriting margins, *i.e.*, to reach its 2.5%—instead of BCBSKS's current projection of 0%—by 2005, and that these increases would be concentrated in the small group and individual markets where BCBSKS was currently losing money. She listed several factors that affect, *e.g.*, increase, an insurance company's underwriting margins other than increasing the premiums. She found that while Anthem argued these factors, there simply was insufficient or unpersuasive evidence presented to her to demon-

strate that Anthem would increase its underwriting margins via any of these alternatives. In short, based upon the evidence before her, Anthem would not have the ability to increase its underwriting margins to 2.5% by 2005 without substantially increasing rates for small groups and individuals.

Our examination of the Commissioner's order reveals no mention of commanding, requiring, or directing cross-subsidization. We agree with the Commissioner that merely because she analyzed various factors that would likely impact Anthem's post-acquisition underwriting margins, and ultimately made those determinations against the proposed acquisition, does not mean that she is commanding cross-subsidization. She is instead doing what the statute requires, which is to examine the proposed transaction from the perspective of policyholders, the insurance-buying public, and the public interest based on the statute's standards.

We also find that the district court's sole reliance upon one excerpt from *Bell*, 227 Kan. 426, to be misplaced. In *Bell*, Blue Cross and Blue Shield of Kansas (BCBSK) filed suit in district court against Bell, the Commissioner of Insurance, to seek review of his order denying all requests for an increase in rates for the year 1979 which BCBSK requested. BCBSK had submitted its request seeking increases in all 21 risk group classifications to the Commissioner per a statute which obligated him to approve the filing unless he found it did not meet the requirements of the act or established an unreasonable, excessive, or unfairly discriminatory rate. The Commissioner denied the request for a number of reasons. These included, among other things, his belief that the administrative expenses were not conservative and therefore were unreasonable, as well as his belief that the company's contingency reserve levels were adequate and did not require any rate increase proposed by BCBSK.

This court reversed the district court decision which had affirmed the Commissioner. Of first, and paramount, concern to the court was the Commissioner's failure to specify the findings of fact, as required by the statutes, supporting his conclusion that the rates should not be increased. *Bell*, 227 Kan. at 433-34. This court determined that there were no findings upon which to base the Com-

missioner's conclusion that BCBSK had failed to address cost containment provisions in provider contracts. It further determined that the record was devoid of evidence with which to support such a conclusion. 227 Kan. at 437. As for the second basis for denial—that the company's contingency reserve levels did not require a rate increase—this court held that the Commissioner's findings also were wholly unsupported by the evidence. 227 Kan. at 441.

The third issue (with which the district court's 12-word excerpt is concerned ) was "who is to have the final authority to group risks into classifications for the establishment of rates on individual policies and on group policies." 227 Kan. at 437. After several pages of analyzing this issue, this court concluded that while the Commissioner had a measure of statutory control, the laws did not "give him authority to govern the everyday management details of BCBSK, or to substitute his judgment for that of the boards of directors of those companies as to either the wisdom and expediency of business policies or the methods of carrying on the business of the companies." 227 Kan. at 439. Within this discussion, the court concluded that "[t]he Commissioner should not substitute his judgment for that of the directors of BCBSK when it comes to grouping and classifying risks for the purpose of establishing rates on individual policies or on group policies." 227 Kan. at 438.

Additionally within this discussion, the *Bell* court concluded that the Commissioner should not require BCBSK to continue subsidizing one risk group at the expense of other groups and that BCBSK, via management decisions, could make the rates for each group self-sustaining, which entailed raising the past rates of the high risk group. It was within this "competing authority" context that the *Bell* court made the comment cited by the district court. As this court cautioned in *McKinney, Administrator v. Miller,* 204 Kan. 436, 437, 464 P.2d 276 (1970), "[e]very statement in a judicial opinion must be interpreted in the light of the structure of the particular case then before the court; otherwise a phrase meaningful for one case might erroneously become dogma for all cases despite essential differences." It is also important to acknowledge that the district court cited only a fragment of the *Bell* language. The *Bell* court's full statement is: "[H]owever, *the goal should be*

that one risk group should not be subsidized at the expense of others." (Emphasis added.) 227 Kan. at 439. Consistent with our statement in *Bell*, the BCBSKS Chief Financial Officer, Donald Lynn, testified in the instant case that the company's previous decision to reduce premiums temporarily on its small group market was motivated in part by a desire to improve its market share and the quality of its risk pool, and that whether the acquisition occurred or not, BCBSKS has already raised premiums for the small group market and had no intention to operate at a loss or subsidize any particular line of business or subset of policyholders by charging low rates unless it has a valid business reason to do so.

*Bell* is further distinguished from our case factually. *Bell* concerned a projected raise in rates for several groups of subscribers to eliminate subsidization in a domestic insurer that was not being acquired by a foreign corporation. Acquisition is an issue in the instant case, however, and this difference is essential. See *McKinney*, 204 Kan. at 437. As further discussed below, the Commissioner has greater discretion in this situation. We agree with *Bell's* statement that the Commissioner under the circumstances of that case cannot get involved in the board's management decisions. She can, however, deny an acquisition based upon their management decisions because of her authority pursuant to the acquisition statute, *e.g.*, when it is not in the public interest.

We hold the district court erroneously relied upon *Bell*.

c. *Surplus*

In addressing the issue of the Commissioner's concerns about future surplus reduction, the district court held that her decision "runs flatly counter to established Kansas law." Specifically, the district court concluded that a possible lowering of the post-acquisition surplus to the range of $90 to $112.5 million still exceeded the legislature's "required minimum levels of surplus for insurance companies doing business in Kansas [K.S.A. 40-2c01]." Consequently, according to the court: "Again, the Commissioner has denied this acquisition because she fears Anthem will comply with Kansas law. K.S.A. 40-401, K.S.A. 40-402, and K.S.A. 40-2c01." The district court cited several cases to demonstrate that the Com-

missioner cannot add or change established legal requirements. It concluded the Commissioner's "argument fails as a matter of law." As articulated by BCBSKS and Anthem, the district court was construing the various insurance code statutes together—K.S.A. 40-3304(d)(1) and 40-2c01—pursuant to the doctrine of *in pari materia*.

In response, the Commissioner rejects what she considers the suggestion of the district court, Anthem, and BCBSKS, *i.e.*, that K.S.A. 40-3304(d)(1) should be interpreted as if it essentially stated that the acquisition must be approved if it complies with otherwise applicable law found in the insurance code. As a result, while she acknowledges that the remaining surplus of $90-$112.5 million would meet the minimum requirements set by the legislature in K.S.A. 40-2c01, she argues that the district court, Anthem, and BCBSKS do not fully appreciate the nature of this transaction. The Commissioner was not reviewing the surplus requirements of an existing company for the purpose of doing business in Kansas. Rather, the Commissioner was reviewing a domestic company which was proposed to be acquired, and thereby controlled, by a foreign company and examining its level of post-acquisition surplus. Consequently, according to the Commissioner, what is legal and appropriate in one context may not be appropriate in another.

She argues that since K.S.A. 40-3304(d) provides her with authority to make decisions in the acquisition process which are in the interest of the public, policyholders, and the insurance-buying public, K.S.A. 40-2c01, and its attendant minimum levels of surplus for current companies, is inapplicable to the acquisition context. The requirements of K.S.A. 40-401 and K.S.A. 40-402 are also inapplicable, for they likewise do not concern acquisitions. Consequently, the cases cited by the district court which prohibit the Commissioner from exceeding statutory authority are inapposite here. Likewise, while we are urged by Anthem and BCBSKS to rely upon the rule of *in para materia* to apply the surplus and other statutory requirements found elsewhere in the insurance code—including premium rate requirements under K.S.A. 40-2215 and dividend requirements under K.S.A. 40-3306—the Commissioner

asks us to reject its widespread application to the acquisition process.

As we have previously stated, we give great deference to the Commissioner's interpretation and find that it is reasonable. Simply meeting statutory minimum surplus requirements or premium rate requirements for an existing domestic company does not automatically equate to operating in the interest of the public, policyholders, or the insurance-buying public in the context of its acquisition by a foreign company. We therefore find the nonacquisition case of *Levinson v. First Delaware Insurance Co.*, 549 A.2d 296 (Del. 1988), cited by Anthem as inapposite. We also find that the interpretation by Anthem and BCBSKS unnecessarily dilutes the Commissioner's discretion in the acquisition statute. We observe, for example, the Commissioner specifically found that after the sponsored demutualization, BCBSKS policyholders would be protected by a surplus less than half the current amount. Although this surplus remaining admittedly would still meet the minimum requirements of K.S.A. 40-2c01, it is reasonable for the Commissioner to be concerned about the impact on policyholders of this abrupt reduction by more than 50% of the company's long-time surplus. We also observe that while the district court, Anthem, and BCBSKS heavily rely upon K.S.A. 40-2c01, its companion statute—K.S.A. 40-2c03—cautions that merely maintaining the minimums should not be confused with good business practice. This statute urges exceeding the minimums because additional capital "helps to secure an insurer against various risks inherent in, or affecting, the business of insurance and not accounted for or only partially measured by the risk-based capital requirements contained in this act." K.S.A. 40-2c03(c). Under the district court's interpretation, the Commissioner's justifiable concern for policyholders would be overridden by a totally separate provision outside the acquisition statute, *i.e.*, the statutory surplus minimum statute.

Furthermore, the district court's interpretation greatly dilutes the significance of the public hearing under K.S.A. 40-3304(d)(2). It also dilutes the significance of the power of the Commissioner to retain attorneys, actuaries, accountants, and other experts to assist her in reviewing the proposed acquisition of control under

K.S.A. 40-3304(d)(3). Simply put, the statutory inquiry, which includes the public hearing, would be improperly limited to simply determining compliance with the code's explicit requirements.

Moreover, if simply meeting other statutory requirements were all that were required for an approved acquisition, there would be no need for the determinations contained in subsections (B) through (E) of K.S.A. 40-3304(d)(1). In other words, the legislature's requirements elsewhere in the insurance code would be the per se determination of what was in the interest of the public, of policyholders, and of the insurance-buying public. Likewise, the "loss of license" factor in subsection 40-3304(d)(A) becomes duplicative of the other code provisions, since a license is dependent upon meeting those requirements, *e.g.*, minimum surplus levels under K.S.A. 40-2c01. See K.S.A. 40-222e. The Anthem and BCBSKS interpretation, therefore, makes part of the legislative act surplusage, which should be avoided if reasonably possible. See *Excel Corp. v. Jiminez,* 269 Kan. 291, 298, 7 P.3d 1118 (2000).

Similarly, if the district court's statutory interpretation were correct, *i.e.*, acquisitions that met the law would be approved and acquisitions that violated the law would not be approved, we believe the legislature would have clearly and simply said so. As *amici* Kansas Hospital Association and Kansas Medical Society point out, at the same time that the legislature adopted the portions of the Insurance Holding Company Act that regulate insurance company mergers and acquisitions, it also adopted an act addressed to general corporations. L. 1974, ch. 92. This Act, since repealed and replaced by K.S.A. 17-1286 *et seq.*, regulated takeovers of Kansas domestic corporations. Like K.S.A. 40-3304, it required a filing with a Commissioner and a hearing. The Securities Commissioner was authorized in K.S.A. 17-1281(b) to deny the proposed acquisition if he or she found it to be "in violation of law" and conversely to enter his or her approval if he or she found it "not in violation of law." *Amici* argue that the legislature thus knew exactly how to reference other law as part of defining the approval process with regard to a corporate takeover. According to *amici*, that the legislature did so in the same session in a statute relating specifically to corporate takeovers indicates "with peculiar force" that it did not

intend the same standard in the Insurance Holding Company Act, citing *State v. Bradley*, 215 Kan. 642, 647, 527 P.2d 988 (1974). "Its absence is compelling evidence that the legislature did not intend to require" mere violation of law as the basis for denial of an acquisition. 215 Kan. at 647. While we do not find this parallel dispositive, it does possess additional persuasive value.

As mentioned, Anthem and BCBSKS argue that we are obligated to construe the insurance statutes *in pari materia.* Among other cases, they cite *Landry v. Graphic Technology, Inc.,* 268 Kan. 359, 365, 2 P.3d 758 (2000), in which we stated: " ' "In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof *in pari materia.*" ' " They further argue that when we do so, the insurance code provisions on surplus and premiums, which they deem to be specific, take precedence over the general provisions of the acquisition statute, citing *Read v. Miller*, 247 Kan. 557, 559, 802 P.2d 528 (1990) (Unless legislative intent appears otherwise, a special statute which relates to particular persons or things will take precedence over a statute dealing with a subject in general.).

This argument does not make the Commissioner's interpretation unreasonable, which is the focus of our inquiry, for a number of reasons. First, despite *Landry's* admonition for a court to not construe just an isolated part or parts of an act, but to construe all parts thereof together, we are not asked to do so. Specifically, BCBSKS and Anthem do not ask us to simply construe the acquisition statute together with all other parts of the Act of which it is a part, *i.e.,* the Insurance Holding Companies Act. Rather, they ask us to construe the acquisition statute with other provisions found throughout the entire Insurance Code, Chapter 40 of the Kansas Statutes Annotated.

Second, even were we to accept their invitation, the acquisition statute itself is the more specific because it alone deals with the exact and unique circumstance at hand, *i.e.*, a proposed acquisition, and hence control, of a domestic insurer by a foreign insurer. We agree with *amicus* Community Catalyst, Inc., *i.e.*, the fact that the Kansas Legislature has enacted a distinct set of laws governing the

review of the acquisition of an insurance company indicates that the legislature intended for the Insurance Commissioner to consider this important transaction as a matter separate from the general regulation of an existing insurance company. See generally *Read*, 247 Kan. 557, Syl. ¶ 1 (K.S.A. 60-203, a specific statute dealing particularly with the commencement of a civil action, takes priority over K.S.A. 60-206(b), a general statute dealing with extensions of time for the entire code of civil procedure); *Sherman County Comm'rs v. Alden*, 158 Kan. 487, 491, 148 P.2d 509 (1944) (statute regarding confirmation of sales in foreclosure of tax liens is specific, and takes priority over, the general statute dealing with confirmation of judicial sales).

Consequently, while the surplus and rates statutes, K.S.A. 40-2c01 and K.S.A. 40-2215, continuously apply to the numerous insurers currently doing business in this state, the acquisition statute applies only to those undergoing a proposed acquisition and only during the limited period of that process. In short, while the Commissioner certainly is not prohibited from considering other insurance code provisions in her deliberations on whether to approve an acquisition, these provisions do not automatically supercede, they are not binding, and certainly they are not dispositive. The acquisition statute therefore outweighs other code provisions which do not specifically deal with acquisitions.

Third, even were we to accept the invitation to construe *in pari materia* based upon *Landry*, we would construe the acquisition statute together with the remaining provisions of the Kansas Insurance Holding Companies Act of which it is a part. In so doing, we find that the Commissioner's interpretation is reinforced by other parts of the Act. While we agree that the Act does contain policy statements about the promotion of business interests, it also is replete with concerns about protecting the public. Thus, while we note that K.S.A. 40-3301(a) states "it may not be inconsistent with the public interest and the interest of policyholders" to, among other things, diversify into new lines of business through acquisition, we hold the Commissioner reasonably concluded that when balancing these competing interests, this policy is outweighed by the other statutory provisions requiring the Commis-

sioner to look out for the public interest. K.S.A. 40-3301 and K.S.A. 40-3304. See *Mitchell v. Liberty Mutual Insurance Co.*, 271 Kan. 684, Syl. ¶ 4, 24 P.3d 711 (2001) (The commissioner of insurance has the power to make reasonable decisions and interpretations in order to carry out the statutory provisions.); see generally *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 865, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984) ("Administrator's interpretation represents a reasonable accommodation of manifestly competing interests and is entitled to deference: the regulatory scheme is technical and complex, the agency considered the matter in a detailed and reasoned fashion, and the decision involves reconciling conflicting policies.").

The legislative history also reinforces the Commissioner's interpretation that the public concern is overriding. The Kansas Insurance Holding Companies Act, which was first enacted in 1974, was patterned after a model bill developed by the National Association of Insurance Commissioners (NAIC), the NAIC Insurance Holding Company System Regulatory Act. See Insurance Holding Company System Regulatory Act, NAIC, *Model Insurance Laws, Regulations, and Guidelines*, pp. 440-38, 440-39 (2001). In presenting the legislation to the Senate Commercial and Financial Institutions Committee in 1974, the Kansas Insurance Department explained that the bill "would strengthen the department's ability to safeguard the interests of the public." See Minutes of the Senate Commercial and Financial Institutions Committee on February 5, 1974, regarding S.B. 929. The bill obviously included what is now 40-3304(d)(1)(C), which has remained unchanged, and is relied upon by the Commissioner in her decision.

The legislature's concern for the public's protection has been ongoing, as partially evidenced by its 1992 addition of subsection (F) [now (E)] to K.S.A. 40-3304(d)(1). L. 1992, ch. 288, sec. 2. It provides an additional basis for a commissioner to deny an acquisition, *i.e.*, when finding that "the acquisition is *likely* to be hazardous or prejudicial to the insurance-buying public." (Emphasis added.) Consequently, when this provision was considered by the 1992 legislature, the Kansas Insurance Department explained to lawmakers that it "[a]dds consideration of whether an acquisition

of a domestic insurer is likely to be hazardous or prejudicial to the insuring public as a reason the Commissioner may disapprove the transaction." See testimony by Dick Brock, Kansas Insurance Department, before the House Committee on Insurance regarding 1992 H.B. 2787, and identical testimony given to the Senate Committee on Financial Institutions and Insurance regarding 1992 H.B. 2787. We find this addition significant, as it is indicative of the legislature's desire to expand the original bases for the Commissioner's authority to be watchful of the public interests in the acquisition context.

Finally, in response to an *amicus* argument, Anthem and BCBSKS deny that their interpretation reduces the Commissioner to a mere rubber-stamper of the legislature. According to them, while the Commissioner may not, for example, use "under-capitalization" as a ground for refusing acquisition when the insurer meets the minimums of K.S.A. 40-2c01, she may still rely upon a ground for which the legislature has not established a statutory requirement. The response to this point was addressed earlier in the opinion. The possession of minimum statutory capitalization by a company seeking to be acquired—which minimum is the remnant following an abrupt and drastic reduction of long-time surplus—may not necessarily be in the interests of the public, the policyholders, or the insurance-buying public.

### d. *Catchall*

After the district court reversed the Commissioner's decision on the grounds of reduction of surplus and increased premiums, it also observed, as a catchall, that the Commissioner always has the ultimate authority to approve proposed insurance rate increases under K.S.A. 40-2215 and to approve dividend distribution from surplus—which would decrease surplus—under K.S.A. 40-3306. Essentially, according to the district court, the Commissioner has therefore acted prematurely. According to this holding, she should have first approved the acquisition and then, as necessary, denied requests for reductions in surplus and proposed rate increases when presented to her in the future.

We hold this conclusion erroneous because it eliminates the Commissioner's proactive role and reduces her to being reactive. The acquisition statute does not require the Commissioner to first approve the acquisition and then await future requests for rate increases and surplus reductions before she is authorized to act. *Cf. National Mutual Casualty Co. v. Hobbs,* 149 Kan. 625, 633, 88 P.2d 1006 (1939) (Pertinent insurance legislation is a progressive and continuous response to avoid the historic "evils" suffered by the people of Kansas.). Indeed, the acquisition statute permits the Commissioner to prevent an insurer's action that is "unfair and unreasonable to policyholders of the insurer and not in the public interest" and *"likely* to be hazardous or prejudicial to the insurance-buying public." (Emphasis added.) K.S.A. 40-3304(d)(1)(C) and (E).

Accordingly, we agree with the statement of *amicus* National Association of Insurance Commissioners that phrases in K.S.A. 40-3304(d)(1) such as "might jeopardize," "plans or proposals," and "likely" clearly communicate the legislature's command to the Commissioner to pass on the proposed acquisition now, rather than attempt to repair or prevent injury to the public at a much later date, when it may be too late to fully protect the public interest and the interests of policyholders. See *Rhode Island Ins. Co. v. Downey,* 95 Cal. App. 2d 220, 232, 212 P.2d 965 (1949) (No requirement of the Insurance Code that the insurance commissioner must wait until an insurance company is insolvent before he takes action to protect the policyholders because to do so is contrary to "the ancient aphorism about locking the barn door after the horse is stolen."); See *Boswell, Inc., d/b/a Reno County Adult Care Home v. Harkins,* 230 Kan. 610, 613-614, 640 P.2d 1202 (1982) (Commissioner not required to withhold action until actual harm had occurred. "Nowhere in the act do we find a requirement of actual harm."). To elaborate on the *Downey* aphorism, the Commissioner is not required to wait until likely future harm to the public appears before locking the barn door; she may do so now as a preventative.

As an expert in the regulation of the insurance industry, the Commissioner is charged with making reasonable decisions and interpretations in order to carry out the statutory provisions.

*Guardian Title Co. v. Bell,* 248 Kan. 146, 805 P.2d 33 (1991); *Mitchell v. Liberty Mut. Ins. Co.,* 271 Kan. 684, 23 P.3d 711 (2001). The Commissioner's interpretation of the acquisition statute has a rational basis to which we give great deference and approve. The district court must be reversed.

Issue 2: *Did the Commissioner act beyond the jurisdiction conferred by the acquisition statute?*

Anthem and BCBSKS also argue that the Commissioner's order of denial was beyond the jurisdiction of the acquisition statute and relief may therefore be granted under K.S.A. 77-621(c)(2). While they identify (c)(2) as a basis for relief, their written arguments which follow that identification instead essentially concentrate on the basis of (c)(4): whether the Commissioner has erroneously interpreted or applied the law, which allegedly results in the Commissioner acting beyond her jurisdiction. As a result, we interpret this argument as essentially the same as (c)(2), which was addressed in great detail in issue 1.

Under this heading, however, Anthem and BCBSKS do add the argument that the Commissioner's order is contrary to the conversion law, K.S.A. 40-4001 *et seq.* Basically, they argue that because the Commissioner approved the conversion of BCBSKS from a mutual company to a stock company, and concluded that (1) the plan of conversion—which paid $131 million of the surplus to policyholders—"is fair and equitable to the policyholders," and that (2) the converted company would meet the minimum requirements to be issued a certificate of authority; therefore, that she may not deny the acquisition by claiming the reduction of surplus was in violation of the acquisition statute, K.S.A. 40-3304(d)(1).

The Commissioner responds by arguing as follows:

"A 'sponsored' demutualization is a two-step process. In this case, the first step is BCBSKS's conversion to a new stock insurer. This transformation from mutual insurer to stock insurer takes place only under the conversion statutes. K.S.A. 40-4001 *et seq.* This occurs, if at all, under the existing BCBSKS management. The second step is the actual acquisition of the 'new' BCBSKS stock insurer by Anthem pursuant to the Kansas Holding Companies Act, K.S.A. 40-3301 *et seq.*

"When K.S.A. 40-4004(a)(4) refers to 'the continued operations of the new stock insurer,' the reference is only to BCBSKS's continued operation as a stock

insurer. It has nothing to do with Anthem's effort to acquire the new company. The Holding Companies Act must be viewed within its own context, *i.e.*, the transfer of control of a domestic insurer. The Commissioner's findings under the conversion statutes are inapplicable."

We agree. More importantly, however, we also observe that while the Commissioner in considering the conversion found BCBSKS as a converted insurer would meet the minimum requirements to be issued a certificate of authority by the Commissioner, *e.g.*, minimum surplus requirements, she did not find all the remaining requirements for conversion. K.S.A. 40-4004(a) states in relevant part:

"The commissioner shall approve the [conversion] plan if the commissioner finds that:

. . . .

"(4) the new stock insurer would meet minimum requirements to be issued a certificate of authority by the commissioner to transact business in this state, *and the continued operations of the new stock insurer would not be hazardous to existing or future policyholders or the public.*" (Emphasis added).

Nowhere in the Commissioner's final order does she find that "the continued operations of the new stock insurer would not be hazardous to existing or future policyholders or the public." It cannot be inferred from her finding that the surplus distribution was fair and equitable to policyholders, nor from her finding that the plan of conversion complies with the provisions of the act; the missing finding is an element separate from these findings. Contrast K.S.A. 40-4004(a)(1) and (2) with (a)(4). Such a finding is requisite to conversion approval. In addition, the Commissioner's order does not expressly state the requisite conclusion, *i.e.*, that she approves the conversion.

For these reasons, we hold that the Commissioner's order was not beyond the jurisdiction conferred by the acquisition statute.

Issue 3: *Is the Commissioner's order based on a determination of fact that is not supported by substantial evidence when viewed in light of the record as a whole?*

Anthem and BCBSKS argue that the order denying the acquisition is not supported by substantial competent evidence and that K.S.A. 77-621(c)(7), therefore, serves as a ground for relief.

## Standard of Review

"This court reviews an appeal from an agency's action under the KJRA as though the appeal had been made directly to this court and is subject to the same limitations of review as the district court." *Winston v. Kansas Dept. of SRS*, 274 Kan. 396, 404, 49 P.3d 1274 (2002); see *Reed v. Kansas Racing Comm'n*, 253 Kan. 602, 609, 860 P.2d 684 (1993) (citing *Peck v. University Residence Committee of Kansas State Univ.*, 248 Kan. 450, 455-56, 456, 807 P.2d 652 [1991]). Accordingly, this issue requires us, as it would the district court, to examine whether the Commissioner's action is based on determinations of fact, made or implied by her, that are supported by substantial competent evidence. See K.S.A. 77-621(c)(7); *Winston*, 274 Kan. at 415; *Kaufman v. Kansas Dept. of SRS*, 248 Kan. 951, 961, 811 P.2d 876 (1991). Substantial evidence is "such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion." *Winston*, 274 Kan. at 415.

In applying the substantial evidence test under K.S.A. 77-621(c)(7), courts may not reweigh the facts, try the case *de novo*, or substitute their own judgment even if they would have found differently. During this process, the courts are not concerned with evidence contrary to the agency findings but must focus solely on evidence in support of the findings. See *Winston*, 274 Kan. at 415; *Kaufman* 248 Kan. at 961-62; *Kansas Racing Management, Inc., v. Kansas Racing Comm'n*, 244 Kan. 343, 365, 770 P.2d 423 (1989). Consequently, the courts must accept as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the agency. They are to disregard any conflicting evidence or other inferences which might be drawn therefrom. See *Reed v. Kansas Racing Comm'n*, 253 Kan. at 609-610, 614 (The Supreme Court does not evaluate credibility and accepts the agency's version of the facts.); *Vakas v. Kansas Bd. of Healing Arts*, 248 Kan. 589, 604, 808 P.2d 1355 (1991). In the case at hand, if the Commissioner's findings of fact are supported by substantial competent evidence, they are conclusive and may not be set aside by this court. See *Sunflower Racing, Inc. v. Board of Wyandotte County Comm'rs*, 256 Kan. 426, 441, 885 P.2d 1233 (1994).

### Reduction in surplus

There is no dispute that the surplus will be reduced by at least $131 million, and John Knack, BCBSKS's vice president, admitted there was absolutely no commitment from Anthem that more capital will be added. Nevertheless, Anthem and BCBSKS first argue that the $131 million reduction has already been approved by the Commissioner in the conversion process, which they claim included a finding that the "continued operations of the new stock insurer would not be hazardous to existing or future policyholders or the public." Accordingly, they imply there can be no substantial competent evidence supporting her findings which contradict this one. This argument was previously addressed and rejected. Among other things, the Commissioner made no such finding and made no express conclusion approving the conversion part of the sponsored demutualization.

Second, Anthem and BCBSKS argue the Commissioner's finding that the remaining surplus of $155 million will be reduced again—to between $90 and $112.5 million—is not supported by substantial evidence. They assert that the finding was improperly based on the testimony of Michael Smith, Anthem's Chief Financial Officer, that Anthem typically seeks over time to capitalize its subsidiaries at 200-250% of control level risk-based capital. We note, however, that although BCBSKS argues the Commissioner guessed as to its authorized control level, Anthem admits the Commissioner used the testimony of BCBSKS's Vice-President of Finance, Donald Lynn, that the control level of risk-based capital for BCBSKS was in the range of $40 to $45 million. Moreover, the record on appeal discloses Smith agreed that at the time, BCBSKS had a surplus of over 600% ($286 million) of the authorized control level ($45 million). According to the Commissioner's math, the resultant range after reduction to 200-250% would equal the $90-$112.5 million.

Nevertheless, BCBSKS argues that the Commissioner disregarded the part of Smith's qualifying testimony that did not suit her purposes, *i.e.*, that Anthem's practice in capitalizing its subsidiaries takes into account their current and projected capital needs

and that Anthem regularly monitors its subsidiaries to ensure that they meet all "internal, NAIC, state, and Blue Cross Blue Shield Association capitalization requirements." The Commissioner found it more important, however, to rely on Mr. Smith's testimony that it had been Anthem's "practice," and Anthem's "intention" in the future, based upon that practice, to capitalize all of its subsidiaries in a range of 200 to 250% of the State-mandated minimum authorized control level on a state-by-state basis in order to ensure Anthem's maximum flexibility.

Anthem and BCBSKS point out, however, that Smith also testified that these reductions were done over reasonable periods of time, not precipitously. They further argue that K.S.A. 40-3306 provides that the Commissioner may disapprove any future requests to reduce surplus via dividend distribution which are not reasonable. Accordingly, she retains authority to ensure that the company does not fall below the statutory surplus minimums. We addressed this argument earlier as well. Whether future reductions are precipitous or not, the acquisition statue allows her latitude to be proactive, not reactive.

As mentioned above, we apply a very deferential standard of review to findings of fact. Based upon that standard, we hold that substantial competent evidence exists to support the Commissioner's finding. In short, consistent with Anthem's typical business practice, it is likely that Anthem will seek to reduce, or that it plans to reduce, BCBSKS's surplus to 200-250% of control level risk-based capital. This reduction, coupled with the earlier reduction of $131 million, decreases by more than one-half the original surplus of $286 million. This ground alone is sufficient to support her conclusions that the sponsored demutualization is unfair and unreasonable to policyholders, not in the public interest, and likely to be hazardous or prejudicial to the insurance-buying public.

In their discussion of an alleged total absence of substantial evidence to support the Commissioner's finding regarding surplus reduction, Anthem and BCBSKS also allege the absence is dramatized by the fact that Anthem offered to guarantee all of the insurance obligations of BCBSKS. According to them, that guarantee would effectively replace the $131 million of distributed surplus

with Anthem's $2.2 billion surplus. They argue that she disregarded the guarantee offer and this disregard was also clearly arbitrary and capricious.

Sixteen days after the evidentiary hearing had closed on January 9, the guaranty offer was attached to the record via Anthem's post-hearing memorandum and proposed findings of fact and conclusions of law. Although not required to do so, the Commissioner did reference the offer in her order as follows:

"The Applicants argue that Anthem will offer guarantees that achieve the stated goal of enhanced strategic and financial flexibility. The guarantees offered, however, do not extend beyond the company's obligations to policyholders. The company's creditors would experience a company that is not as well capitalized, as before the sponsored demutualization. This evidence is given little weight."

The acquisition statute requires the Commissioner to evaluate the impact of the proposed acquisition on the policyholders, the insurance-buying public, and the public at large. The creditors of a large company can be numerous and are part of the public. It is doubtful the proposed guaranty would be judicially construed to include creditors. See *Iola State Bank v. Biggs*, 233 Kan. 450, Syl. ¶ 2, 662 P.2d 563 (1983) (After the intention of the parties or the scope of the guarantor's undertaking has been determined by general rules of construction, the obligation is strictly construed and may not be extended by construction or implication.).

The Commissioner also argues that she had to weigh the value of the guarantee against the value of the actual "cash in hand" available from the existing surplus in determining which option better protected the policyholders, insurance-buying public, and the public at large. She chose the certainty of the surplus. This is not an unreasonable decision, since guaranties can be more difficult to enforce than the contract underlying the debt itself. See *Trego Wakeeney State Bank v. Maier*, 214 Kan. 169, 176, 519 P.2d 743 (1974) ("[T]he contracting of a debt is a single act, resulting in an immediate and unconditional obligation, while the contract of guaranty is complicated, and subject to many conditions which may defeat its enforcement."); *Iola State Bank v. Biggs*, 233 Kan. at 456 (listing several defenses which relieve the guarantor of obligation to pay). We conclude the Commissioner did not err in

choosing the surplus over the guaranty. See *Mitchell v. Liberty Mut. Ins. Co.*, 271 Kan. 684, 24 P.3d 711 (2001).

Premium Rate Increase

Anthem and BCBSKS allege the Commissioner's finding that the premium rate increases would be greater with the sponsored demutualization than without it is not supported by substantial evidence. Their assertion warrants a short review of this and related findings.

The Commissioner found that due to rising medical costs, health insurance rates will increase whether or not the sponsored demutualization is approved, which increase she described as "trend" in the market. She also found that the sponsored demutualization would cause BCBSKS's premium rates to increase above trend and that the increases would be at least 6% to 7% greater than predicted increases without sponsored demutualization. More specifically, she found that in order for Anthem to increase the underwriting margin to 2.5% by 2005, its premium rates necessarily would be 7% higher than the premium rates required to achieve BCBSKS's projection of 0% underwriting margin by 2005, and would be 14% above trend. The Commissioner also found that Anthem's primary objective is to match or exceed its top competitor in underwriting margins and that its competitors have underwriting margins of 4.5% to 5%. In order for Anthem to achieve its goal of an underwriting margin of 4.5% to 5% by 2005, Anthem necessarily would need to increase premium rates significantly more than 14% above trend.

In making her findings, the Commissioner gave substantial weight to the PwC report because, in the Commissioner's words, it is "the only systematic, analytic review of the Kansas health insurance market." The Commissioner discounted the evidence presented by BCBSKS—the testimony of Professors Paul Feldstein and Henry Butler—on the ground that it centered on economic theories and the theoretical contestability of health insurance markets without linking the theories to actual Kansas premium rates. The Commissioner also discounted the evidence presented by the *amici* Kansas Medical Society and the Kansas Hospital Associa-

tion—testimony of economist Carl Schramm—on the ground it was too general in scope and provided no analysis of the Kansas insurance market. The Commissioner also discounted as outside the scope of statutory review the testimony of Marvin Fairbanks of Stormont-Vail Healthcare about Anthem's handling of claims.

Anthem and BCBSKS raise several objections to the Commissioner's findings, but focus on her finding that Anthem would be expected to reach a 2.5% underwriting margin by 2005, while by that same date BCBSKS would have reached an underwriting margin of 0%. They question the substantiality of the PwC report and the testimony of a PwC principal, Sandra Hunt, which they assert are the only evidence supporting the Commissioner's finding that Anthem would increase premium rates faster than BCBSKS. Specifically, they both contend that Section 6 of the report and Hunt's testimony rely on flawed assumptions, which makes the evidence speculative and conjectural, citing *e.g., In re Providence-St. Margaret Health Center,* 232 Kan. 787, 659 P.2d 199 (1983).

As a PwC principal, Hunt led its team that performed the market impact analysis. She specializes in government health policy, statistical modeling, Medicaid managed care plans, and development of models for new health care delivery systems. She has 17 years of experience in health care economics research, including nearly 15 years as a consultant for the public sector and private industry.

Hunt testified that the PwC projections were based on the assumption that Anthem, as a typical stock-owned company, has a goal of reaching a 3% underwriting margin by 2005, and that the 3% figure was derived from Anthem's IPO document. The PwC report states that BCBSKS's management "has stated as its goal a return to underwriting gains ranging from 2% to 3% by 2007," and Hunt testified that there was documentary evidence for the statement. Anthem's 2-year accelerated underwriting margin goal was attributed by Hunt to pressure from stockholders to achieve underwriting gains, *i.e.,* because it is a stock company, it would seek to achieve profitability sooner than BCBDKS, a mutual company. As she further explained in her testimony, the conclusion that Anthem would raise rates in the individual and small group markets 6 to 7% faster than BCBSKS is based on comparing a 0% under-

writing margin for BCBSKS with a 2.5% underwriting margin for Anthem—notwithstanding the fact the PwC report shows that both of them would have goals of 2.5% margins—is based on her belief that Anthem's management would be more inclined to get to its goal quicker than BCBSKS would get to its goal.

These opinions were joined by Kathy Greenlee, General Counsel for KID and head of the testimonial team. She testified that she believed Anthem had a goal of achieving underwriting margins in the range of 3%, not only because of its witnesses' testimony, but also because that was similar to Anthem operations in other States. She therefore characterized it as an expectation. She also felt Anthem was more likely than BCBSKS to achieve this goal because, as a stock company, it would have more incentive to reach the goal to satisfy shareholders. According to her, BCBSKS "may have the goal, but they have not achieved that goal in the past. If they don't achieve that goal, the owners of that company will have a far different reaction than the owners of Anthem if Anthem does not achieve that goal." Greenlee stated that BCBSKS has "not positioned the company to make profits in the past . . . they have run the company with a different philosophy."

Anthem effectively cross-examined Hunt and Greenlee and attempted to show Hunt's opinion in particular was based on speculation because it was centered on the different inclination of BCBSKS from that of Anthem. Where Hunt used the word "inclination," the PwC report couches the concept in terms of the difference between the underwriting losses tolerated by BCBSKS over the past several years and the industry standard goal of 2 to 3%, which Anthem reasonably may be expected to share. The PwC report states that BCBSKS has had underwriting losses for several years, that "[u]nderwriting gains of 2% to 3% are a common goal of for-profit health insurers," and thus "[i]t is likely that Anthem will expect a faster improvement in performance than would otherwise be required." Hunt's testimony about premium rate increases by Anthem centered on a greater urgency for Anthem to reach the 2 to 3% underwriting margin goal. The PwC report mentions Anthem's anticipated urgency but also concentrates on the

difference between current operating practices of BCBSKS and Anthem. The PwC report states in its conclusions:

"It is likely that premium rates for BCBSK[S] will increase in the future regardless of a change in ownership status. However, it is also likely that premium rates will increase at a somewhat higher pace, or that provider payment amounts will be constrained, to earn underwriting gains that have not been required historically. . . .

"Overall, BCBSK[S] has had underwriting losses averaging 2% over the past several [6] years, with losses in 2000 reaching nearly 7%. The estimate for 2001 is an underwriting loss of approximately 3%. It is likely that Anthem will expect a faster improvement in performance than would otherwise be required, and market segments with large losses will see significant increases.

. . . .

"Underwriting gains of 2% to 3% are a common goal of for-profit health insurers, and we would expect that premium rates in Kansas would increase by an amount sufficient to realize this level of gain. Compared to a steady state scenario of 2% underwriting losses, Individual and Small Group premiums are expected to be approximately 14% higher by 2005. Taking into account medical inflation and other components of premium increases, some market segments are likely to see premium increases ranging up to 20% per year for several years. For the small group market in particular, premium rates are estimated to nearly double current levels by 2005.

. . . .

"In summary, it is likely that insurance coverage will remain available at current levels, but that premium rates will increase by 6% to 7% above the levels that might be expected in the absence of the Anthem purchase, with broad variation by market segment."

Anthem and BCBSKS concede that when they attack Hunt's alleged assumptions, they are attacking her opinions that it was likely Anthem would reach the underwriting goal of 2.5% sooner than BCBSKS. We first observe that Hunt's testimony (both pre-filed and live) and the PwC report—which contained her opinion of acceleration—came into evidence without objection by Anthem and BCBSKS. In fact, the PwC report and Hunt's prefiled testimony were introduced into evidence by BCBSKS. See *Zurawski v. Kansas Dept. of Revenue*, 18 Kan. App. 2d 325, 329, 851 P.2d 1385, *rev. denied* 253 Kan. 864 (1993) (an objection to evidence must usually be made at the time of the hearing and failure constitutes waiver of defect and so error may not be challenged on judicial review); K.S.A. 60-456(c) (Unless the judge excludes the

testimony, he or she shall be deemed to have made the finding requisite to its admission.). We next observe that the admissibility of Hunt's testimony and the PwC report were not challenged as a point of error on appeal. While the failure of Anthem and BCBSKS earlier to object and later to challenge on appeal is not necessarily dispositive of the issue of whether substantial evidence exists, it does greatly dilute their argument that the report and testimony contain unsound assumptions.

Second, the admissibility of the report and testimony was up to the discretion of the Commissioner. The record is unclear as to whether Hunt was testifying as a lay or expert witness. Through either scenario, however, because of facts demonstrating her background in the health insurance field and her knowledge of Anthem and BCBSKS, she was entitled to testify about her opinions. See K.S.A. 60-456(a) and (b); *Hawkinson v. Bennett,* 265 Kan. 564, 592, 962 P.2d 445 (1998) (Whether a witness, expert or layperson, is qualified to testify as to his or her opinion is to be determined by the trial court in the exercise of its discretion. That discretion is not subject to review except for abuse.). In *Hawkinson,* 265 Kan. 564, a layperson was allowed to testify about his calculations of loss of future profits over the objections of defendants which included, among other things, arguments that the evidence was too contingent, remote, and speculative. Anthem and BCBSKS cite *Gas Service Co. v. Kansas Corporation Commission,* 4 Kan. App. 2d 623, 641, 609 P.2d 1157, *rev. denied* 228 Kan. 806 (1980), for the proposition that allegedly speculative opinion testimony was, and should be, excluded. *Gas Service,* however, supports the Commissioner. The Court of Appeals did not exclude the testimony as speculative. Rather, after characterizing the issue as a "question of fact," it found that the corporation commission adopted its staff's figures over those proposed by plaintiff. 4 Kan. App. 2d at 640-41. As a result, it was clear that the plaintiff's evidence was admitted, weighed by the commission, and simply found less persuasive than the commission's staff's figures.

Once the Hunt testimony and the PwC report were admitted into evidence, it was up to the Commissioner to decide what weight and credibility, if any, to give to each. In *Hawkinson,* 265 Kan. at

592, this court held that the jury was free to give whatever weight, if any, it deemed appropriate to the challenged testimony on loss of future profits and how to calculate the loss. In the case at hand, the Commissioner determined that PwC performed the only systematic, analytic review of the Kansas health insurance market and, therefore, gave the report substantial weight.

Third, under our deferential standard of review, we accept as true the evidence and all inferences to be drawn therefrom which support or tend to support the Commissioner's findings. We are not concerned with evidence contrary to her findings, but only the evidence in support of her findings. In addition to the above-mentioned testimony and report, we note the evidence establishes that in recent years Anthem has acquired a number of insurance companies. Testimony from Anthem's own officials demonstrate they have been successful in managing those companies to be profitable. According to the PwC report, Anthem's operating revenue and premium equivalent had grown from nearly $8 billion in 1998 to $11.8 billion in 2000 and, as of the date of the report, appeared on track to achieve $13.8 billion in 2001. All time periods show an operating gain. Overall, net income has grown from $172 million to $226 million, and may reach $285 million in 2001. Anthem's operating margin has also improved, from .7% in 1998 to 2.2% in 2000 and a reported 2.7% as of June 2001. The PwC report also reveals that a common goal of for-profit health insurers is underwriting gains of 2% to 3%. Furthermore, Anthem admitted that its first strategic objective is to meet or exceed the performance of its comparable competitors across several criteria, including operating margins, and that the operating margins of its comparable competitors average 4.5% to 5%.

The evidence also discloses that BCBSKS's history, by contrast, has been more conservative. It has averaged negative 2% underwriting margins for the last 6 years. It may be fairly inferred from this evidence, and the evidence concerning Anthem's performance history and strategic objectives, that it is likely Anthem will expect a faster improvement in performance than BCBSKS would.

BCBSKS additionally argues that the assumption Anthem would increase underwriting margins faster than BCBSKS is flawed be-

cause Hunt "refused" to take into account the Commissioner's authority to regulate rates, the elasticity of demand for health insurance, and the contestability of Kansas' health insurance market. Their latter two allegations are belied by the PwC report, which states:

"Increases in premium rates will be tempered by market conditions and the willingness of consumers to pay higher premiums. Premium increases could be mitigated by changes in benefit design or the number of people choosing to purchase insurance.

. . . .

"It is possible that higher premiums could attract additional health plans to the Kansas market, resulting in increased competition."

With regard to the Commissioner's regulation of rates, Hunt also testified: "Actually, quite frankly, given the underwriting losses, particularly in the small group market, we would expect that the rate increases would be approved." In light of all the other evidence the Commissioner considered, we do not find this fatal to the Commissioner's findings.

BCBSKS further asserts that Hunt refused "to consider the effects of competition and adverse selection when forming her opinion about the transaction's effect on rates." However, as mentioned earlier, Hunt did acknowledge that increases in premium rates will be tempered by market conditions and the willingness of consumers to pay higher premiums. She also acknowledged that premium increases could be mitigated by the number of people choosing to purchase insurance, and it was possible that higher premiums could attract additional health plans to the Kansas market, resulting in increased competition.

BCBSKS also faults Hunt for ignoring economic factors that would temper rate increases and cites the testimony of its own economic witnesses for the proposition that "raising rates more rapidly than competitors is likely to result in policy cancellations and sharply *reduce* underwriting profits." As we have previously stated, the Commissioner did not credit the testimony of Feldstein and Butler on the ground that it concentrated on economic theories and the theoretical contestability of health insurance markets without linking the theories to actual Kansas premium rates.

Finally, it should also be noted that making projections for insurance companies is not an exact science. As confirmed by BCBSKS's Vice-President of Finance, Donald Lynn: "In my experience, a health care company's long-term five-year projections of future performance are inherently uncertain. Blue Cross and Blue Shield is no exception." Nevertheless, as the PwC report stated: "While there are no clear guidelines available to predict precisely what will occur, indications of likely outcomes can be identified."

As part of their argument about the lack of substantial competent evidence, Anthem and BCBSKS also complain that the Commissioner improperly shifted the burden of proof from the testimonial team to them. In support, they cite language from several of her findings, *e.g.*, Anthem and BCBSKS provided "no substantial evidence." A greater number of her findings, however, also provide that they presented "no evidence" or "little evidence." More importantly, the Commissioner had concluded "[t]*he lack of evidence* supporting a conclusion that Anthem will reduce medical expenses, change benefit design, increase membership or lower administrative expenses, necessarily points the analysis toward premium rate increase." This demonstrates, particularly in light of the PwC report and Hunt's testimony, that the Commissioner simply weighed the evidence and found that the evidence was more weighty and persuasive that the premium rates would be increased faster with the acquisition than without. She did not improperly shift the burden of proof.

After examining the record in light of our deferential standard of review—where we do not reweigh the facts, try the case *de novo,* or substitute our judgment even if we would have found differently—we find the Commissioner's determination that the premium rate increases would be greater with the sponsored demutualization is supported by such legal and relevant evidence as a reasonable person would accept as being sufficient to support the decision.

Issue 4: *Is the Commissioner's order unreasonable, arbitrary, or capricious?*

BCBSKS argues that the Commissioner's order is unreasonable, arbitrary, and capricious and relief may therefore be granted under

K.S.A. 77-621(c)(8). While BCBSKS does identify (c)(8) as a basis for relief, its written arguments which follow that identification instead concentrate on the basis for relief in (c)(7): whether the Commissioner's determination is "not supported by evidence that is substantial when viewed in light of the record as a whole." Indeed, in support of the argument that we are required to examine whether the evidence upon which the Commissioner relied is substantial, BCBSKS cites *In re Providence-St. Margaret Health Center,* 232 Kan. at 794: " 'Findings not based on evidence, but on suspicion and conjecture, are arbitrary and baseless,' " and Anthem cites *Vakas,* 248 Kan. at 594 (arbitrary and capricious conduct is shown when an agency order is not supported by substantial evidence). As a result, while (c)(8) can cover a number of things, *e.g.,* the reasonableness of the agency's exercise of discretion in reaching the determination, see *Sunflower Racing, Inc., v. Board of Wyandotte County Comm'rs,* 256 Kan. 426, 445, 885 P.2d 1233 (1994), we interpret the request by Anthem and BCBSKS as essentially the same as (c)(7). Consequently, this argument was addressed in great detail in issue 3.

In its argument of this issue, BCBSKS claims that alleged speculation about the future is an improper basis for denial, citing *Ginther v. Commissioner of Insurance,* 427 Mass. 319, 693 N.E. 153 (1998). *Ginther* is distinguishable in a number of respects, however. The issue in that case was whether a witness who had testified at a public hearing opposing an insurance company acquisition had standing to file suit for himself and his company. Therefore, the court's language partially cited by BCBSKS, which is a reiteration of the trial court's findings, is dicta:

"Plaintiffs' alleged injuries are speculative and are not the proximate consequence of the subject acquisition. Whether Paul Revere [the acquiring insurance company] will discontinue its disability policy line, discontinue Niagara's [plaintiff's] agency, or implement a policy of resisting claims is wholly speculative." 427 Mass. at 321-22.

In short, the court ruled Ginther had no standing to bring suit under Massachusetts law because he had not yet been harmed. By contrast, in the case at hand the Commissioner—who had stand-

ing—found after lengthy hearings that the likelihood of such harm existed.

The Commissioner's order is not unreasonable, arbitrary, or capricious.

Issue 5: *Are K.S.A. 40-3304(d)(1)(C) and (E) unconstitutional delegations of a legislative function under Art. 2, § 1 of the Kansas Constitution?*

For its final argument, BCBSKS contends that the acquisition statute (K.S.A. 40-3304[d][1]) is unconstitutional because it violates the nondelegation doctrine. As a result, it contends, K.S.A. 77-621(c)(1) provides a basis for judicial relief. The nondelegation doctrine flows from the separation of powers principles embodied in Art. 2, § 1 of the Kansas Constitution, which provides that "[t]he legislative power of this state shall be vested in a house of representatives and senate." The doctrine allows for a particular statute to be struck down because it constitutes an unconstitutional delegation of legislative power to an administrative agency. See *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n,* 264 Kan. 363, 395, 956 P.2d 685 (1997).

We recently stated our standards for reviewing allegations of unconstitutionality in *Mudd v. Neosho Memorial Regional Med. Center,* 275 Kan. 187, 197, 62 P.3d 236 (2003):

"As the party asserting a statute's unconstitutionality, claimants' burden is a 'weighty one.' *Barrett v. U.S.D. No. 259,* 272 Kan. 250, 255, 32 P.3d 1156 (2001). 'This is as it should be for the enacted statute is adopted through the legislative process ultimately expressing the will of the electorate in a democratic society.' [Citation omitted.] Consequently, while the determination of whether a statute violates the constitution is a question of law over which we have unlimited de novo review, we have often held:

' "A statute is presumed constitutional, and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the constitution before it may be struck down. [Citations omitted.] 'This court not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute.' *State v. Durrant,* 244 Kan. 522, 534, 769 P.2d 1174, *cert. denied* 492

U.S. 923 (1989)." [Citation omitted.]' *Injured Workers of Kansas v. Franklin,* 262 Kan. 840, 844, 942 P.2d 591 (1997)."

Specifically, BCBSKS argues that the legislature has delegated power in the acquisition statute to the Commissioner without including within the delegation specific standards and limitations to define how the Commissioner should exercise that power. The Commissioner responds by stating that the Insurance Holding Companies Act—K.S.A. 40-3301 *et seq.*—taken as a whole, provides constitutionally sufficient policies and standards to guide the Commissioner in administering and enforcing the law.

As early as 1871, this court stated that while the legislature possesses all the legislative power of the State, "it is generally found impracticable for them to exercise this power in detail. They may do so if they choose, or they may enact general provisions and leave those who are to act under these general provisions to use their discretion in filling up the details." *Coleman v. Newby,* 7 Kan. 82, 88 (1871).

Over 100 years later we considered an insurance statute challenged under a separation of powers argument in *Guardian Title Co., v. Bell,* 248 Kan. 146, 153, 805 P.2d 33 (1991). Its guidance is relevant to our inquiry:

"We live in an increasingly complex society. To expect the legislature to have the time and expertise to deal with minute details statutorily is not realistic.

"In the case of *In re Sims,* 54 Kan. 1, 11, 37 P. 135 (1894), this court said that in its judgment a strict application of the separation of powers doctrine is inappropriate today in a complex state government where administrative agencies exercise many types of power and where legislative, executive, and judicial powers are often blended together in the same administrative agency.

"In the 97 years that have passed since *In re Sims,* this court has consistently stated that an absolute separation of powers is neither practical nor possible. [Citations omitted.]

"What is required is that a statute express the law in general terms and delegate the power to apply it to an executive agency under standards provided by the legislature. *Wesley Medical Center v. McCain,* 226 Kan. 263, 270, 597 P.2d 1088 (1979). This has been the fundamental rule since early statehood. See *Coleman v. Newby,* 7 Kan. 82, 89 (1871).

"Where flexibility in fashioning administrative regulations to carry out statutory purpose is desirable in light of complexities in the area sought to be regulated,

the legislature may enact statutes in a broad outline and authorize the administrative agency to fill in the details. [Citation omitted.]

"In testing a statute for adequacy of standards, the character of the administrative agency is important. [Citation omitted.] Here, we are dealing with the insurance commissioner, an expert in regulation of the insurance industry, with a large staff and paid consultants available. The insurance commissioner is charged with regulating a huge, complex industry, and to require explicit, definitive statutes would severely impede, if not make impossible, the regulation of the insurance industry. What is a sufficient standard must necessarily vary somewhat according to the complexity of the area sought to be regulated. [Citations omitted.]

"Standards may be implied from the statutory purpose. *People v. Wright*, 30 Cal. 3d 705, 713, 180 Cal. Rptr. 196, 639 P.2d 267 (1982). . . .

"The modern trend, which we ascribe to, is to require less detailed standards and guidance to the administrative agencies in order to facilitate the administration of laws in areas of complex social and economic problems. [Citations omitted.]" 248 Kan. at 153-54.

The Commissioner in the case at hand argues the legislature has made the statutory purpose of the acquisition statute clear in K.S.A. 40-3301, 40-3304(d)(1), and the Insurance Holding Companies Act as a whole. She further argues that she has more than adequate guidelines to understand the legislative purposes and policies of the Act. When acting pursuant to the acquisition statute, she asserts that K.S.A. 40-3301(a)(1)-(5) identifies five factors that may be considered to be in the public interest. She further contends that the Act also expresses in K.S.A. 40-3301(b) those factors that are not to be considered in the public interest, and that it makes unequivocal declarations as to the statute's policies and purposes in K.S.A 40-3301(c), all of which are to be considered by the Commissioner.

K.S.A. 40-3301 states:

"(a) It is hereby found and declared that it may not be inconsistent with the public interest and the interest of policyholders to permit insurers to:

(1) Engage in activities which would enable them to make better use of management skills and facilities;

(2) diversify into new lines of business through acquisition or organization of subsidiaries;

(3) have free access to capital markets which could provide funds for insurers to use in diversification programs;

(4) implement sound tax planning conclusions; and

(5) serve the changing needs of the public and adapt to changing conditions of the social, economic, and political environment, so that insurers are able to compete effectively and to meet the growing public demand for institutions capable of providing a comprehensive range of financial services.

"(b) It is further found and declared that the public interest and the interests of policyholders are or may be adversely affected when;

(1) Control of an insurer is sought by persons who would utilize such control adversely to the interests of policyholders;

(2) acquisition of control of an insurer would substantially lessen competition or create a monopoly in the insurance business in this state;

(3) an insurer which is part of a holding company system is caused to enter into transactions or relationships with affiliated companies on terms which are not fair and reasonable; or

(4) an insurer pays dividends which jeopardize the financial condition of such insurer.

"(c) It is hereby declared that the policies and purposes of this act are to promote the public interest by:

(1) Facilitating the achievement of the objectives enumerated in subsection (a) of this section;

(2) requiring disclosure of pertinent information relating to changes in control of an insurer;

(3) requiring disclosure by an insurer of material transactions and relationships between the insurer and its affiliates, including certain dividends paid by the insurer; and

(4) providing standards governing material transactions between the insurer and its affiliates."

We agree with the Commissioner. The standards found in K.S.A. 40-3301, together with those in K.S.A. 40-3304, provide sufficient guidance to meet constitutional muster for the Commissioner, as an expert in the regulation of the huge, complex insurance industry. See *Guardian Title Co. v. Bell*, 248 Kan. at 154. The case of *Vakas*, 248 Kan. 589, provides support. There, this court rejected a constitutional challenge—based on the nondelegation doctrine—to the license reinstatement statute contained in the Kansas Healing Arts Act found at K.S.A. 65-2801 *et seq*. We acknowledged that the reinstatement statute, K.S.A. 65-2844, when viewed alone, did not provide notice of what conduct will allow or prevent reinstatement. 248 Kan. at 601. Nevertheless, after viewing the purpose of the Act and reading the Act in its entirety, especially the provisions regarding revocation, the court held "[t]he legislature did not im-

properly delegate its power to the Board by failing to set out adequate guidance in the specific statute relating to reinstatement." 248 Kan. at 602.

*U.S.D. No. 279 v. Secretary of Kansas Dept. of Human Resources,* 247 Kan. 519, 802 P.2d 516 (1990), provides additional guidance. Similar to the case at hand, the school board argued that a particular statute contained in the Professional Negotiations Act, K.S.A. 1989 Supp. 72-5430a, failed to provide guidelines or limits, and the broad grant of power to the Secretary of the Department of Human Services violated the nondelegation doctrine. The board argued that while 72-5430a stated the Secretary had the specific authority to "enter a final order granting or denying in whole or in part the relief sought" regarding allegations of prohibited practices in school negotiations, there was no authority to impose a $7,700 remedy in public funds to the victim. This court disagreed, holding this argument was contrary to the legislative intent to grant the Secretary discretionary authority to fashion an appropriate remedy where relief is called for.

We confirmed that in construing the statute, the legislative intention is to be determined from consideration of the entire Act. In doing so, we observed that K.S.A. 1989 Supp. 72-5426 required a board or association to file a petition with the Secretary seeking an investigation and determination on the issue of impasse and required the Secretary to begin impasse resolution procedures and conduct a hearing. The Secretary is also granted power to appoint a mediator, K.S.A. 72-5427, and factfinder, K.S.A. 72-5428. In addition, K.S.A. 1989 Supp. 72-5430a(b) mandated that the Secretary *shall* make findings of fact and dismiss the complaint or enter a final order granting or denying the relief sought.

We held these statutory provisions provide substantial guidelines and limitations on the Secretary's authority concerning impasse procedures and prohibited practices. In particular, "K.S.A. 1989 Supp. 72-5430a *grants the Secretary discretion to fill in the details of appropriate relief* given the circumstances relating to any of the several prohibited practices." (Emphasis added.) 247 Kan. at 534.

In short, in the statutory scheme at issue in the instant case, the legislature directs the Commissioner to utilize administrative

power and "fill in the details" within the definite outline set forth in the Act when confronted with a domestic insurer's proposed acquisition. See *Bell,* 248 Kan. at 154. As a result, this statutory scheme is not an unconstitutional delegation of legislative power to an administrative agency.

The decision of the district court is reversed, and the order of the Commissioner is affirmed.

ABBOTT and LUCKERT, JJ., not participating.

LARSON, S.J., and DAVID KNUDSON, J., assigned.